# Illinois Official Reports

## Supreme Court

---

### *Hooker v. Illinois State Board of Elections*, 2016 IL 121077

---

| | |
|---|---|
| Caption in Supreme Court: | JOHN HOOKER *et al.*, Appellees, v. ILLINOIS STATE BOARD OF ELECTIONS *et al.* (Support Independent Maps, Appellant). |
| Docket No. | 121077 |
| Filed<br>Rehearing denied | August 25, 2016<br>October 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, the Hon. Diane J. Larsen, Judge, presiding. |
| Judgment | Affirmed.<br>Mandate to issue immediately. |
| Counsel on Appeal | Michele Odorizzi, John A. Janicik, Lori E. Lightfoot, and Chad M. Clamage, all of Mayer Brown LLP, of Chicago, for appellant.<br><br>Robert T. Shannon and Adam R. Vaught, both of Hinshaw & Culbertson LLP, and Richard J. Prendergast and Michael T. Layden, both of Richard J. Prendergast, Ltd., and Michael J. Kasper, of Chicago, and Eric M. Madiar, of Springfield, for appellees.<br><br>Constantine L. Trela, Jr., Tacy F. Flint, and Neil H. Conrad, all of Sidley Austin LLP, of Chicago, for *amici curiae* League of Women Voters of Illinois *et al*. |

Ruth Greenwood and Annabelle Harless, both of Campaign Legal Center, of Chicago, for *amici curiae* Illinois Public Interest Research Group *et al*.

Justices

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Freeman, Burke, and Theis concurred in the judgment and opinion.

Chief Justice Garman dissented, with opinion, joined by Justices Thomas and Karmeier.

Justice Thomas dissented, with opinion, joined by Chief Justice Garman and Justice Karmeier.

Justice Karmeier dissented, with opinion, joined by Chief Justice Garman and Justice Thomas.

Justice Karmeier dissented upon denial of rehearing, with opinion, joined by Chief Justice Garman and Justice Thomas.

**OPINION**

¶ 1    This case addresses the question of whether the circuit court erroneously held that the redistricting initiative petition submitted by Support Independent Maps (Independent Maps) failed to comply with the requirements of article XIV, section 3, of our constitution (Ill Const. 1970, art. XIV, § 3), thus precluding its inclusion on the ballot at the November 8, 2016, Illinois general election. On the grounds that the public interest requires a timely resolution of this matter, we granted Independent Maps' emergency motion to transfer the appeal from the appellate court. See Ill. S. Ct. R. 302(b) (eff. Oct. 4, 2011). This court ordered expedited briefing that has now been completed. We also granted a group of business, consumer, and public interest organizations led by the League of Women Voters leave to file an *amicus curiae* brief in support of Independent Maps pursuant to Supreme Court Rule 345 (eff. Sept. 20, 2010). Reviewing the merits of the appeal before us, we now affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3    The Illinois Constitution of 1970 may be amended by three methods: (1) constitutional convention (Ill. Const. 1970, art. XIV, § 1); (2) "[a]mendments by General Assembly" (Ill. Const. 1970, art. XIV, § 2); and (3) ballot initiatives (Ill. Const. 1970, art. XIV, § 3). Ballot initiatives, the method at issue here, may only be used for amendments directed at "structural and procedural subjects contained in Article IV" of the constitution (Ill. Const. 1970, art. XIV, § 3; Ill. Const. 1970, art. IV), pertaining to Illinois's legislative branch. The ballot initiative at

issue addresses redistricting, the process used to redraw the legislative and representative districts following each federal decennial census (Ill. Const. 1970, art. IV, § 3).

¶ 4 In May 2016, Independent Maps filed with the Secretary of State a petition proposing the amendment of article IV, section 3, of the constitution, to replace the current system for redrawing Illinois's legislative and representative districts. That section currently provides:

"(a) Legislative Districts shall be compact, contiguous and substantially equal in population. Representative Districts shall be compact, contiguous, and substantially equal in population.

(b) In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative Districts and the Representative Districts.

If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10. The Commission shall consist of eight members, no more than four of whom shall be members of the same political party.

The Speaker and Minority Leader of the House of Representatives shall each appoint to the Commission one Representative and one person who is not a member of the General Assembly. The President and Minority Leader of the Senate shall each appoint to the Commission one Senator and one person who is not a member of the General Assembly.

The members shall be certified to the Secretary of State by the appointing authorities. A vacancy on the Commission shall be filled within five days by the authority that made the original appointment. A Chairman and Vice Chairman shall be chosen by a majority of all members of the Commission.

Not later than August 10, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.

If the Commission fails to file an approved redistricting plan, the Supreme Court shall submit the names of two persons, not of the same political party, to the Secretary of State not later than September 1.

Not later than September 5, the Secretary of State publicly shall draw by random selection the name of one of the two persons to serve as the ninth member of the Commission.

Not later than October 5, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.

An approved redistricting plan filed with the Secretary of State shall be presumed valid, shall have the force and effect of law and shall be published promptly by the Secretary of State.

The Supreme Court shall have original and exclusive jurisdiction over actions concerning redistricting the House and Senate, which shall be initiated in the name of the People of the State by the Attorney General." Ill. Const. 1970, art. IV, § 3.

¶ 5 Since the adoption of the 1970 Constitution, the General Assembly has agreed on a districting plan without resort to the backup provisions only once, after the most recent federal census. Pub. Act 97-6 (eff. June 3, 2011). Following each of the other four decennial censuses, the formation of a redistricting commission has been necessary. *People ex rel. Scott v. Grivetti*,

50 Ill. 2d 156 (1971); *Schrage v. State Board of Elections*, 88 Ill. 2d 87 (1981); *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270 (1992); *Cole-Randazzo v. Ryan*, 198 Ill. 2d 233 (2001); *Beaubien v. Ryan*, 198 Ill. 2d 294 (2001).[1] In three out of those four occasions, the commission has deadlocked, triggering the selection of an additional member to break the tie through the drawing of lots. See *Schrage*, 88 Ill. 2d at 92; *Burris*, 147 Ill. 2d at 277 (1991); *Beaubien*, 198 Ill. 2d at 299. While that process has been criticized, it has withstood federal constitutional challenge in the federal courts (*Winters v. Illinois State Board of Elections*, 197 F. Supp. 2d 1110 (2001), *aff'd*, 535 U.S. 967 (2002)).

¶ 6        To replace the current system, Independent Maps' proposed amendment to article IV, section 3, would substitute an entirely new section 3 that fundamentally restructures the redistricting process. The General Assembly's role would be eliminated from the process, with primary responsibility for drawing legislative and representative districts falling to a new "Independent Redistricting Commission." Commission members would be selected through a process involving limited legislative input. Specifically, the provision proposed by Independent Maps provides:

"(a) The Independent Redistricting Commission comprising 11 Commissioners shall adopt and file with the Secretary of State a redistricting plan for Legislative Districts and Representative Districts by June 30 of the year following each Federal decennial census. Legislative Districts shall be contiguous and substantially equal in population. Representative Districts shall be contiguous and substantially equal in population. The redistricting plan shall comply with Federal law. Subject to the foregoing, the Commission shall apply the following criteria: (1) the redistricting plan shall not dilute or diminish the ability of a racial or language minority community to elect the candidates of its choice, including when voting in concert with other persons; (2) the redistricting plan shall respect the geographic integrity of units of local government; and (3) the redistricting plan shall respect the geographic integrity of communities sharing common social and economic interests, which do not include relationships with political parties or candidates for office. The redistricting plan shall not either intentionally or unduly discriminate against or intentionally or unduly favor any political party, political group or particular person. In designing the redistricting plan, the Commission shall consider party registration and voting history data only to assess compliance with the requirements in this subsection (a).

(b) For the purpose of conducting the Commissioner selection process, an Applicant Review Panel comprising three Reviewers shall be chosen in the following manner. Beginning not later than January 1 and ending not later than March 1 of the year in which the Federal decennial census occurs, the Auditor General shall request and accept applications to serve as a Reviewer. The Auditor General shall review all

---

[1]This court held that the redistricting commission created after the 1970 census was illegally constituted. Nonetheless, we permitted the redrawn map drafted by that commission to be used as a "provisional" plan in 1972. We directed, however, that a "redistricting plan for subsequent elections shall be adopted pursuant to the procedures outlined in section 3 of article IV of the 1970 constitution of this State." *People ex rel. Scott v. Grivetti*, 50 Ill. 2d at 168. The legislature later adopted that same map. See Pub. Act 78-42 (eff. June 30, 1973); Robert M. Rogers, *Illinois Redistricting History Since 1970*, 3 Illinois General Assembly Legislative Research Unit Research Response (2008).

- 4 -

applications and select a pool of 30 potential Reviewers. The Auditor General should select applicants for the pool of potential Reviewers who would operate in an ethical and non-partisan manner by considering whether each applicant is a resident and registered voter of the State and has been for the four years preceding his or her application, has demonstrated understanding of and adherence to standards of ethical conduct and has been unaffiliated with any political party for the three years preceding appointment. By March 31 of the year in which the Federal decennial census occurs, the Auditor General shall publicly select by random draw the Panel of three Reviewers from the pool of potential Reviewers.

(c) Beginning not later than January 1 and ending not later than March 1 of the year in which the Federal decennial census occurs, the Auditor General shall request and accept applications to serve as a Commissioner on the Independent Redistricting Commission. By May 31, the Panel shall select a pool of 100 potential Commissioners. The Panel should select applicants for the pool of potential Commissioners who would be diverse and unaffected by conflicts of interest by considering whether each applicant is a resident and registered voter of the State and has been for the four years preceding his or her application, as well as each applicant's prior political experience, relevant analytical skills, ability to contribute to a fair redistricting process and ability to represent the demographic and geographic diversity of the State. The Panel shall act by affirmative vote of two Reviewers. All records of the Panel, including applications to serve on the Panel, shall be open for public inspection, except private information about applicants for which there is no compelling public interest in disclosure.

(d) Within 45 days after the Panel has selected the pool of 100 potential Commissioners, but not later than June 23 of the year in which the Federal decennial census occurs, the Speaker and Minority Leader of the House of Representatives and the President and Minority Leader of the Senate each may remove up to five of those potential Commissioners. Thereafter, but not later than June 30, the Panel shall publicly select seven Commissioners by random draw from the remaining pool of potential Commissioners; of those seven Commissioners, including any replacements, (1) the seven Commissioners shall reside among the Judicial Districts in the same proportion as the number of Judges elected therefrom under Section 3 of Article VI of this Constitution, (2) two Commissioners shall be affiliated with the political party whose candidate for Governor received the most votes cast in the last general election for Governor, two Commissioners shall be affiliated with the political party whose candidate for Governor received the second-most votes cast in such election and the remaining three Commissioners shall not be affiliated with either such political party and (3) no more than two Commissioners may be affiliated with the same political party. The Speaker and Minority Leader of the House of Representatives and the President and Minority Leader of the Senate each shall appoint one Commissioner from among the remaining applicants in the pool of potential Commissioners on the basis of the appointee's contribution to the demographic and geographic diversity of the Commission. A vacancy on the Panel or Commission shall be filled within five days by a potential Reviewer or potential Commissioner from among the applicants remaining in the pool of potential Reviewers or potential Commissioners, respectively, in the manner in which the office was previously filled.

(e) The Commission shall act in public meetings by affirmative vote of six Commissioners, except that approval of any redistricting plan shall require the affirmative vote of at least (1) seven Commissioners total, (2) two Commissioners from each political party whose candidate for Governor received the most and second[-]most votes cast in the last general election for Governor and (3) two Commissioners not affiliated with either such political party. The Commission shall elect its chairperson and vice chairperson, who shall not be affiliated with the same political party. Six Commissioners shall constitute a quorum. All meetings of the Commission attended by a quorum, except for meetings qualified under attorney-client privilege, shall be open to the public and publicly noticed at least two days prior to the meeting. All records of the Commission, including communications between Commissioners regarding the Commission's work, shall be open for public inspection, except for records qualified under attorney-client privilege. The Commission shall adopt rules governing its procedure, public hearings and the implementation of matters under this Section. The Commission shall hold public hearings throughout the state both before and after releasing the initial proposed redistricting plan. The Commission may not adopt a final redistricting plan unless the plan to be adopted without further amendment, and a report explaining its compliance with this Constitution, have been publicly noticed at least seven days before the final vote on such plan.

(f) If the Commission fails to adopt and file with the Secretary of State a redistricting plan by June 30 of the year following a Federal decennial census, the Chief Justice of the Supreme Court and the most senior Judge of the Supreme Court who is not affiliated with the same political party as the Chief Justice shall appoint jointly by July 31 a Special Commissioner for Redistricting. The Special Commissioner shall adopt and file with the Secretary of State by August 31 a redistricting plan satisfying the requirements set forth in subsection (a) of this Section and a report explaining its compliance with this Constitution. The Special Commissioner shall hold at least one public hearing in the State before releasing his or her initial proposed redistricting plan and at least one public hearing in a different location in the State after releasing his or her initial proposed redistricting plan and before filing the final redistricting plan with the Secretary of State. All records of the Special Commissioner shall be open for public inspection, except for records qualified under attorney-client privilege.

(g) An adopted redistricting plan filed with the Secretary of State shall be presumed valid and shall be published promptly by the Secretary of State.

(h) The Supreme Court shall have original jurisdiction in cases relating to matters under this Section."

¶ 7　　Independent Maps filed a petition to bring this proposed amendment before the voters by using the ballot initiative process governed by article XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. XIV, § 3). That provision requires petitions seeking to amend article IV to be signed by "a number of electors equal in number to at least eight percent of the total votes cast for candidates for Governor in the preceding gubernatorial election." Ill. Const. 1970, art. XIV, § 3. The State Board of Elections determined that the petition received more than the required number of valid signatures.

¶ 8        Five days after Independent Maps submitted its petition, a "taxpayer's suit" was filed in the circuit court of Cook County pursuant to section 11-303 of the Code of Civil Procedure (735 ILCS 5/11-303 (West 2014)). The lawsuit sought to enjoin the defendants from disbursing public funds to determine the petition's compliance with the Election Code (10 ILCS 5/1-1 *et seq.* (West 2014)) or to place the proposal on the ballot at the upcoming November 2016 General Election. The complaint also requested declaratory relief.[2]

¶ 9        The action was filed by a political committee called People's Map, along with its chairperson, John Hooker, and individual members and leaders of other groups,[3] each alleged to be Illinois residents and taxpayers. The named defendants were the Board of Elections and its chairperson and members; Leslie Munger, the State Comptroller; Jesse White, the Secretary of State; Michael Frerichs, the State Treasurer; David Orr, the County Clerk of Cook County; and the Board of Election Commissioners for the City of Chicago, its chairperson, and members. Later, the circuit court entered an agreed order dismissing Orr and the Chicago Board of Election Commissioners, along with its chair and members, without prejudice.

¶ 10       Although Independent Maps was not originally included as a party, it was later granted leave to intervene. See 735 ILCS 5/2-408 (West 2014). No question is raised on the sufficiency of the case law permitting intervention by an entity in support of its own ballot initiative proposal (see *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 506 (1994) (*per curiam*) (hereinafter *CBA II*); *Chicago Bar Ass'n v. State Board of Elections*, 137 Ill. 2d 394, 396 (1990) (hereinafter *CBA I*); *Coalition for Political Honesty v. State Board of Elections*, 65 Ill. 2d 453, 456 (1976) (*per curiam*) (hereinafter *Coalition I*)).

¶ 11       The complaint at issue here had 11 counts. The first six were directed against all defendants and sought a declaratory judgment that the amendment to article IV, section 3 (Ill. Const. 1970, art. IV, § 3), is unconstitutional because it exceeds the scope of ballot initiatives permitted under article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3). Relying on another constitutional provision, count VII also seeks a declaratory judgment. Counts VIII through XI seek a permanent injunction based on the allegations in the prior counts.

¶ 12       Article XIV, section 3, limits the scope of permissible ballot initiatives "to structural and procedural subjects contained in Article IV [Ill. Const. 1970, art. IV, § 3]," the legislative article. Ill. Const. 1970, art. XIV, § 3. Count V of the plaintiffs' complaint alleged that the latter provision limited the ballot initiative process to proposing changes in the structure and procedure of the legislature. Because Independent Maps' proposal addresses the redistricting process rather than the organization of the General Assembly or "the process by which it adopts a law," the plaintiffs contended it impermissibly falls outside article XIV, section 3.

---

[2]The parties do not dispute that a taxpayer action for declaratory and injunctive relief is a proper method of challenging the constitutionality of a proposed ballot initiative. Even though the petition has not been officially declared valid or been certified for placement on the November 2016 ballot, the issue in this appeal is ripe. No additional matters appear to stand in the way of the proposal being placed in the ballot. The only steps remaining for the Board of Elections are solely administrative. See *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 506-07 (1994), agreeing with the dissent (*id.* at 515-16 (Harrison, J., dissenting, joined by Miller and Heiple, JJ.)).

[3]The remaining plaintiffs are Frank Clark, Leon Finney, Elzie Higgenbottom, Raymond Chin, Fernando Grillo, Jorge Perez, and Craig Chico.

¶ 13 Alternatively, counts I through IV and VI alleged that, even if redistricting constitutes a "structural and procedural subject[ ] contained in Article IV," the proposed ballot initiative is invalid because it is not "limited" to those subjects, violating article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3). According to count I, the initiative exceeds those limitations by adding to the existing duties of the Auditor General enumerated in article VIII of the constitution (Ill. Const. 1970, art. VIII). Count II alleged the initiative unconstitutionally modifies our courts' jurisdiction as currently stated in the judicial article (Ill. Const. 1970, art. VI). Count III asserted the proposal would improperly impose new duties on both the Chief Justice of this court and the most senior Justice who is not affiliated with the same political party as the Chief Justice. Count IV contended the proposed initiative is invalid because it would impose a new requirement that the members of this court be affiliated with a political party. According to count VI, Independent Maps' proposal exceeds the limits mandated in article XIV, section 3, by eliminating the Attorney General's authority to commence actions pertaining to legislative redistricting.

¶ 14 Similar to counts I through VI, count VII sought a declaratory judgment against all defendants. Count VII did not, however, allege a violation of article XIV, section 3. Rather, it relied on an alleged violation of article III, section 3, of our constitution (Ill. Const. 1970, art. III, § 3). Article III, section 3, provides that "[a]ll elections shall be free and equal." Ill. Const. 1970, art. III, § 3. The plaintiffs asserted that Independent Maps' ballot initiative does not comply with that requirement because it improperly includes separate and unrelated questions into one ballot proposition.

¶ 15 Counts VIII through XI present no new substantive claims for challenging the validity of this proposed ballot initiative. Instead, they merely incorporated by reference the complaint's previous allegations and requested a permanent injunction to preclude public funds from being disbursed to evaluate the sufficiency of the petition or to place the measure on the ballot at the November 8, 2016, general election. Count VIII was directed at the State Board of Elections, its officers, and members, while Count IX was directed at the Board of Election Commissioners for the City of Chicago and its officers and members, as well as the County Clerk of Cook County. These defendants have already been dismissed from the case. Accordingly, count IX was stricken and is not before this court. Count X was directed at the Comptroller and State Treasurer, and count XI sought an injunction against the Secretary of State.

¶ 16 On May 20, 2016, the plaintiffs were given leave to file their complaint, and Independent Maps filed its answer. The remaining defendants filed a separate, joint answer. The plaintiffs moved for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (734 ILCS 5/2-615(e) (West 2014)), asking that the court grant both declaratory and injunctive relief. Independent Maps filed a cross-motion for judgment on the pleadings, seeking dismissal of the plaintiffs' complaint with prejudice.

¶ 17 The circuit court held a hearing on both motions before granting the plaintiffs' motion as to counts I through VII, concluding that the proposed ballot initiative did not comply with the requirements in our constitution. The court then denied Independent Maps' motion on those counts. The court entered no judgment on counts VIII, X, and XI, seeking injunctive relief. To prevent the absence of a judgment on those three counts from delaying appellate review, the court expressly found that there was no just reason for delaying enforcement or appeal of its

judgment pursuant to Illinois Supreme Court Rule 304(a). Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 18　　Independent Maps immediately filed a notice of appeal to the appellate court and asked that the case be expedited. See Ill. S. Ct. R. 311(b) (eff. Mar. 8, 2016). It then filed a motion to transfer the case directly to this court pursuant to Illinois Supreme Court Rule 302(b) (eff. Oct. 4, 2011). Rule 302(b) permits those transfers when the public interest requires prompt adjudication of the matter by the supreme court. We allowed that motion on July 22, 2016, ordering the appeal to be taken directly to us and establishing an expedited briefing schedule for the parties. We also permitted a group consisting of the League of Women Voters and more than two dozen other business, civic, and public interest groups to file an *amicus curiae* brief in support of Independent Maps.[4] Following receipt of the parties' briefs, the matter has been submitted to the court without oral argument.

¶ 19　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 20　　In its appeal, Independent Maps argues that the circuit court erred in granting judgment on the pleadings in favor of the plaintiffs pursuant to section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2014)) and that, instead, the court should have allowed its cross-motion for judgment on the pleadings and dismissed the plaintiffs' complaint with prejudice.

¶ 21　　The standards guiding our review of this appeal are well established. Judgment on the pleadings is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 454 (2010). In ruling on a motion for judgment on the pleadings, a court may consider only those facts appearing on the face of the pleadings, matters subject to judicial notice, and any judicial admissions in the record. All well-pleaded facts and reasonable inferences based on those facts are taken as true. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005); *M.A.K. v. Rush-Presbyterian-St.-Luke's Medical Center*, 198 Ill. 2d 249, 255 (2001). We review the grant of judgment on the pleadings *de novo*. *Pekin Insurance*, 237 Ill. 2d at 454. *De novo* review is also appropriate here because the resolution of this case turns on the interpretation and application of the Illinois Constitution, creating a question of law. *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 254-55 (2003).

¶ 22　　In challenging the ballot initiative, the plaintiffs advanced two basic lines of constitutional argument: (1) the ballot initiative exceeds the scope of permissible amendments pursuant to

---

[4]The following groups have joined the League of Women Voters: the Small Business Advocacy Council Illinois, Illinois Campaign for Political Reform, CHANGE Illinois, Champaign County Chamber of Commerce, McCormick Foundation, Union League Club of Chicago, West Rogers Park Community Organization, Illinois Farm Bureau, Better Government Association, Chicago Southside Branch NAACP, Independent Voters of Illinois-Independent Precinct Organization, Rockford Chamber of Commerce, Naperville Area Chamber of Commerce, Illinois Chamber of Commerce, Chicagoland Chamber of Commerce, Metropolitan Planning Council, Business and Professional People for the Public Interest, Latino Policy Forum, Sargent Shriver National Center on Poverty Law, Illinois Public Interest Research Group, Common Cause, Citizen Advocacy Center, the Civic Federation, Commercial Club of Chicago, Chicago Embassy Church, and Illinois Hispanic Chamber of Commerce.

article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), because it is not "limited to structural and procedural subjects contained in Article IV," the constitution's legislative article (counts I through VI of the plaintiffs' complaint) and (2) it violates article III, section 3, of the constitution, stating that "[a]ll elections shall be free and equal" (Ill. Const. 1970, art. III, § 3), because it impermissibly combines separate and unrelated questions into a single ballot proposition (count VII of the plaintiffs' complaint). Within the plaintiffs' argument about article XIV, section 3, they address several proposed changes to the redistricting process. As we noted in *Coalition for Political Honesty v. State Board of Elections*, 83 Ill. 2d 236, 247 (1980) (*per curiam*) (hereinafter *Coalition II*) (citing 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2710 (hereinafter Proceedings)), the limitation established in article XIV, section 3, "is apparently unique to Illinois," severely undermining the guidance that may be obtained from the case law of our sister states addressing limitations on ballot initiatives. We note, however, that other jurisdictions have upheld the propriety of enjoining citizen initiatives proposing amendments when the applicable constitutional requirements are not met. *Coalition I*, 65 Ill. 2d at 461-62. When addressing constitutional amendments,

> " '*the will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the constitution whose revision or amendment is sought*, or by an act of the legislative department of the State, which alone would be authorized to speak for the people upon this subject ***.' 1 Cooley's Constitutional Limitations, 84-85 (8th ed. 1927). (Emphasis added.)" *Coalition I*, 65 Ill. 2d at 460-61.

¶ 23    In our constitution, the framers chose to limit the scope of ballot initiatives in article XIV, section 3. That section states, in relevant part: "Amendments shall be limited to structural and procedural subjects contained in Article IV," our legislative article. Ill. Const. 1970, art. XIV, § 3. We have already addressed this language in four cases: *CBA I*, 137 Ill. 2d at 396; *CBA II*, 161 Ill. 2d at 506; *Coalition I*, 65 Ill. 2d at 457, and *Coalition II*, 83 Ill. 2d at 247. Thus,

> "[t]he controlling legal principles are settled. The prior constitutions of this State did not provide for amendment through the direct initiative process. ([*CBA I*], 137 Ill. 2d at 398.) The Framers of the 1970 Illinois Constitution intended article XIV, section 3, to be a very limited form of constitutional initiative. The Framers considered that a general initiative provision was unnecessary due to the liberalized amendment procedures of the new constitution. ([*CBA I*], 137 Ill. 2d at 401.) ***.
>
> Based on the Framers' concerns, article XIV, section 3, provides only for amendment of the legislative article, article IV. Further, not every aspect of the legislative article is subject to amendment through the initiative process. Rather, " ' "Amendments shall be limited to structural *and* procedural subjects contained in Article IV." ' (Emphasis added.) [*CBA I*], 137 Ill. 2d at 398, quoting Ill. Const. 1970, art. XIV, § 3." *CBA II*, 161 Ill. 2d at 508-09.

¶ 24                          The Proposed Role of the Auditor General

¶ 25    Because we find this issue dispositive, we first examine count I of the plaintiffs' complaint. That count inserts the Auditor General into the redistricting process for the first time.

¶ 26    In its appeal before this court, Independent Maps presents three main arguments: (1) assigning the Auditor General duties related to redistricting does not "change" his

constitutional duties established in article VIII, section 3, because the new duties relate to "redistricting" under article IV; (2) the new duties do not constitute the type of "substantive change" to policy matters that concerned the delegates at the 1970 Constitutional Convention; and (3) redistricting reforms would be hobbled if "non-legislative actors" could not be assigned new duties. Before we address these arguments, we must review the current constitutional provisions relating to our Auditor General and the additional duties interposed by the proposed initiative.

¶ 27 Our constitution mandates that the Auditor General (1) "shall conduct the audit of public funds of the State," (2) "shall make additional reports and investigations as directed by the General Assembly," and (3) "shall report his findings and recommendations to the General Assembly and to the Governor." Ill. Const. 1970, art. VIII, § 3(b). In addition to the duties already imposed on the Auditor General by our constitution, the proposed ballot initiative imposes several other duties. Indeed, the proposed ballot initiative greatly expands the duties of that office. While the Auditor General plays no part in the current redistricting process, under the proposed ballot initiative, that office would be responsible for multiple tasks critical to the success of the new redistricting plan. Under the proposed amendment,

> "[f]or the purpose of conducting the Commissioner selection process, an Applicant Review Panel comprising three Reviewers shall be chosen in the following manner. Beginning not later than January 1 and ending not later than March 1 of the year in which the Federal decennial census occurs, the Auditor General shall request and accept applications to serve as a Reviewer. The Auditor General shall review all applications and select a pool of 30 potential Reviewers. The Auditor General should select applicants for the pool of potential Reviewers who would operate in an ethical and non-partisan manner by considering whether each applicant is a resident and registered voter of the State and has been for the four years preceding his or her application, has demonstrated understanding of and adherence to standards of ethical conduct and has been unaffiliated with any political party for the three years preceding appointment. By March 31 of the year in which the Federal decennial census occurs, the Auditor General shall publicly select by random draw the Panel of three Reviewers from the pool of potential Reviewers."

After the Applicant Review Panel is constituted, the auditor must undertake another task, that of "request[ing] and accept[ing] applications to serve as a Commissioner on the Independent Redistricting Commission."[5]

¶ 28 Objecting to these changes, count I of the plaintiffs' complaint alleged that imposing duties on the Auditor General violates article XIV, section 3, of our constitution, limiting the scope of ballot initiatives "to structural and procedural subjects contained in Article IV." The plaintiffs assert that the additional duties appear to require the Auditor General to conduct extensive screening steps and applicant interviews to ensure compliance with the criteria established in the initiative for members of the Applicant Review Panel. In turn, Independent Maps counters that the Auditor General "already has a substantial staff devoted to a wide variety of different tasks and therefore should be capable of undertaking the task of screening applicants for the Applicant Review Panel."

---

[5]The plaintiffs' complaint does not challenge this aspect of the Auditor General's participation.

¶ 29    While it is unclear from the record exactly how great a burden the additional duties imposed by the proposed initiative would create, two points appear certain. First, winnowing the number of applicants statewide down to a pool of 30 reviewers is likely to be a time-consuming and resource-intensive task. Indeed, the mandate that the Auditor General evaluate the "ethical conduct" and partisan leanings of "each applicant" who applies from across the state is likely to require considerable effort, time, and expense. Conversely, the time and resources expended on that process will necessarily be unavailable to perform the duties already specifically assigned to the Auditor General in article VIII, section 3. That alteration in the duties of the Auditor General, in itself, has a material effect on another section of our constitution, in violation of article XIV, section 3.

¶ 30    Second, and more importantly, the parties do not explain how the Auditor General's hypothetical ability to perform the newly assigned redistricting tasks affects the constitutionality of the proposal. Indeed, this argument conflicts with Independent Maps' own, quite accurate, description of the proper division of labor in the review process. As explained in its reply brief, "whether or not a provision is a good idea is beside the point for purposes of the constitutional analysis. It is for the voters to decide whether a proposed constitutional amendment is wise or workable; *the courts' task is simply to decide whether it is limited to a structural and procedural subject in Article IV*." (Emphasis added.) We agree and reject Independent Maps' claim that the new duties assigned to the Auditor General under its plan are constitutional because they are not unduly burdensome.

¶ 31    Independent Maps also argues that its proposed amendment does not, in fact, "change" the constitutional duties of the Auditor General and that its newly imposed duties do not raise the type of concerns raised during the Sixth Illinois Constitutional Convention in 1970. In discussing the latter point, it maintains that the ballot initiative comports with constitutional standards because it is "not being used as a subterfuge to undermine the duties the Constitution assigns to the Auditor General in Article VIII," distinguishing it from *CBA I*. Independent Maps adds that "the key point for purposes of Article XIV, § 3 is that the Redistricting Initiative is aimed solely at reforming the redistricting process and is *not* designed to affect the auditing function established by Article VIII, § 3." (Emphasis in original.)

¶ 32    What these arguments fail to recognize, however, is twofold. First, nothing in our current constitution, its development, or this court's case law requires a proposed ballot initiative to be designed *intentionally* to undercut or otherwise even affect another constitutional provision to be found invalid under article XIV, section 3. *The propriety of Independent Maps' unexpressed underlying intent is simply not a factor in the test established in the plain language of that article.*

¶ 33    Certainly, during the debates at the 1970 Constitutional Convention, the possibility that a ballot initiative could provide a "backdoor" means of altering other constitutional provisions or even the substantive law was discussed. However, the intentional abuse of the ballot initiatives was not the sole incentive for enacting the limitations in article XIV, section 3, nor was it a factor incorporated into the standard set out in article XIV, section 3. The only relevant restriction in that section was that the ballot proposition be "limited to structural and procedural subjects contained in Article IV," the constitution's legislative article. Ill. Const. 1970, art. XIV, § 3.

¶ 34    Moreover, the framers of our constitution intended this court alone "to determine whether constitutional requirements for a proposed amendment were satisfied." *Coalition I*, 65 Ill. 2d at 462. That role does not require us to read between the lines of every proposal in an attempt to discern the propriety of the proponent's underlying intentions; our role is solely to determine whether the proposal comports with the strict limitations set out in article XIV, section 3.

¶ 35    Second, at its core, the question in this case requires us to construe the relevant constitutional provisions, a purely legal question. As this court recently explained in *Walker v. McGuire*, we apply the same general principles to construe both statutory and constitutional provisions. When construing a constitutional provision, our primary purpose is to effectuate " 'the common understanding of the persons who adopted it—the citizens of this state'." *Walker v. McGuire*, 2015 IL 117138, ¶ 16 (citing *Kanerva v. Weems*, 2014 IL 115811, ¶ 36). If the language of the provision is unambiguous, we must give it effect without resorting to aids of statutory construction. *Kanerva*, 2014 IL 115811, ¶ 36. Only if the provision is ambiguous will we "consult the drafting history of the provision, including the debates of the delegates to the constitutional convention." *Walker*, 2015 IL 117138, ¶ 16 (citing *Glisson v. City of Marion*, 188 Ill. 2d 211, 225 (1999), and *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 13 (1996)). In addition, "[o]ne contending that language should not be given its natural meaning understandably has the burden of showing why it should not." *Coalition I*, 65 Ill. 2d at 464.

¶ 36    The plain language of article XIV, section 3, unambiguously states that constitutional amendments created by ballot initiative "shall be limited to structural and procedural subjects contained in Article IV." Ill. Const. 1970, art. XIV, § 3. "It is clear from the debates of the Constitutional Convention of 1970 that only a very limited form of constitutional initiative was acceptable." *CBA I*, 137 Ill. 2d at 401; see also *CBA II*, 161 Ill. 2d at 508-09 (restating the same conclusion). In fact, the 1970 convention delegates expressly rejected an alternative provision granting citizens the authority to seek a ballot initiative affecting a broader range of subject matter. *Coalition I*, 65 Ill. 2d at 467. Moreover, not only was the scope of permissible ballot initiatives in article XIV, section 3, limited to the amendment of the legislative article, it was intentionally restricted to a subset of topics relating to that article, namely, " 'structural *and* procedural subjects contained in Article IV.' " (Emphasis in original.) (Internal quotation marks omitted.) *CBA II*, 161 Ill. 2d at 509 (quoting *CBA I*, 137 Ill. 2d at 398).

¶ 37    In *Coalition I* and *Coalition II*, we quoted from an explanation provided by the spokesman for the majority on the Constitutional Convention Committee on the legislature, Louis Perona, addressing the intentionally limited nature of amendments that could be enacted by ballot initiative. Delegate Perona emphasized the framers' rationale for limiting the reach of ballot initiatives,

   "As I indicated preliminarily in my remarks, I think the limitation on this initiative eliminates the abuse which has been made of the initiative in some states. The attempt has been made here to prevent it being applied to ordinary legislation or *to changes which do not attack or do not concern the actual structure or makeup of the legislature itself.* (4 Proceedings 2911.)" (Emphasis added.) *Coalition I*, 65 Ill. 2d at 470.

¶ 38    We further stated in *Coalition I*,

   "Any offered amendment under the initiative obviously must comply with the procedure and the limitations on amendment set out in [article XIV,] section 3 before it can be submitted to the electorate. As this court has observed: 'The constitution is the

supreme law, and every citizen is bound to obey it and every court is bound to enforce its provisions. It is a most extraordinary doctrine that the court has a discretion to enforce or not enforce a provision of the constitution according to its judgment as to its wisdom or whether the public good will be subserved by disregarding it.' *People ex rel. Miller v. Hotz*, 327 Ill. 433, 437." *Coalition I*, 65 Ill. 2d at 460.

Thus, this court is obliged to respect the imitations placed on the scope of ballot initiatives by article XIV, section 3, as approved by the citizens of this state. Those limitations alone must guide our review of Independent Maps' arguments.

¶ 39 Returning to the task of construing article XIV's limitation on the permissible subject matter of the ballot initiative process, our only concern in this case must be the proposed initiative's compliance with the applicable standard expressed in article XIV, section 3, of our constitution: whether the proposal is "limited to structural and procedural subjects contained in Article IV." Ill. Const. 1970, art. XIV, § 3.

¶ 40 In *CBA I*, this court was similarly asked to address a ballot initiative's effects on another constitutional provision. There, the proposed amendment required each legislative house to create a "revenue committee" possessing a designated number of members. More critically, any bill that increased the state's revenue required a three-fifths vote in each house before becoming law. In analyzing whether that proposal violated article XIV, section 3, we focused not on whether it encompassed both structural and procedural components but on whether it was "*limited* to structural and procedural *subjects contained in Article IV.*" (Emphases in original.) (Internal quotation marks omitted.) *CBA I*, 137 Ill. 2d at 403.

¶ 41 "[W]e [found] that the proposed Amendment [was] not *limited to* the structural and procedural subjects of article IV. Wrapped up in this structural and procedural package is a substantive issue not found in article IV—the subject of increasing State revenue or increasing taxes." (Emphasis in original.) *CBA I*, 137 Ill. 2d at 404. We further explained that

"if this court finds that the proposed Amendment falls within the limitations of section 3 of article XIV then almost any substantive issue can be cast in the form of an amendment to the structure and procedure of the legislative article by using the same scenario." *CBA I*, 137 Ill. 2d at 405.

¶ 42 Here, the sole provision in our constitution currently addressing the "subject" of the Auditor General's job duties is indisputably article VIII, section 3 (Ill. Const. 1970, art. VIII, § 3). As presently constituted, article IV does not mention the "subject" of the Auditor General's office or its duties, even in passing. Moreover, the additional duties the ballot initiative imposes on the Auditor General creates changes that neither " 'attack [n]or *** concern the actual structure or makeup of the legislature itself.' " *Coalition I*, 65 Ill. 2d at 470 (quoting 4 Proceedings 2911 (statements of Delegate Perona)). Therefore, the duties of the Auditor General have never been and are not now a "subject contained in Article IV" as currently constituted. Thus, that provision is not a proper "subject" of the legislative article, in violation of the limitation in article XIV, section 3.

¶ 43 Finally, Independent Maps makes the policy argument that upholding the circuit court's finding that the plaintiffs were entitled to judgment on the pleadings will "make it largely impossible to make meaningful reforms in the redistricting process." We respectfully disagree. The Auditor General is not the only potential nonlegislative actor capable of filling the duties outlined in its proposal. Certainly Illinois has other offices or individuals that are

- 14 -

unencumbered by the limitations expressed in Article XIV. Indeed, the scheme proffered in the instant proposal is not the only model of redistricting reform that could be imagined. The constitutional right of the citizens of this state to alter the legislative article by ballot initiative is not tied to any particular plan, and we trust that the constitutional confines of article XIV, section 3, are sufficiently broad to encompass more than one potential redistricting scheme.

¶ 44     We conclude that the duties assigned to the Auditor General by the ballot initiative at issue in this case do not comport with the strict limitations in article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3). Therefore, the proposition submitted by Independent Maps must fail. We hold that the circuit court properly granted the plaintiffs' motion for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (734 ILCS 5/2-615(e) (West 2014)). In reaching this conclusion, we emphasize that it is based solely on the constitutional infirmity of the particular ballot initiative before this court. Our decision is not intended to reflect in any way on the viability of other possible redistricting reform initiatives.

¶ 45     Because we affirm the circuit court's grant of the plaintiff's motion on the pleadings, we need not consider the remaining arguments on appeal, including the parties' invitation to determine whether *any* hypothetical ballot initiative addressing the redistricting process could be constitutional. Accordingly, we leave that question for another day.

¶ 46                         III. CONCLUSION

¶ 47     Even when concerned citizens legitimately attempt to exercise their constitutional right to seek changes in their state government through ballot initiatives, this court is constrained by the expressed intent of the framers of our constitution to review the propriety of only the specific provisions in the proposal before it. In conducting that review, we must first and foremost look to the plain language adopted by the framers. That is the most certain route to determining the framers' intent.

¶ 48     In this case, our inquiry is limited to the intent expressed by the plain language of article XIV, section 3. The intent demonstrated by both the plain constitutional language and this court's prior case law imposes clear restrictions on the scope of permissible ballot initiatives. As both parties expressly acknowledge, the wisdom of placing before the voters of this state any particular ballot initiative seeking reform of the redistricting process, as well as the workability of that reform, is irrelevant to this limited issue and not a matter properly before this court. We may not ignore our mandate by simply deferring to the redistricting approach proffered by a particular ballot proposal, no matter how appealing it may be. It is our role to review all ballot initiatives for constitutional merit only, and we will examine all future ballot initiative proposals brought before this court on the merit of their particular provisions.

¶ 49     Here, after closely examining the framers' carefully chosen language, as previously interpreted by this court, we conclude the ballot initiative in this case fails to comport with the restrictions incorporated into article XIV, section 3, to protect the integrity of this state's constitution. For the reasons stated above, we affirm the judgment of the circuit court of Cook County. The mandate of this court shall issue immediately.

¶ 50     Affirmed.

¶ 51     Mandate to issue immediately.

CHIEF JUSTICE GARMAN, dissenting:

I join and agree with Justice Karmeier's dissent. I write separately to express my concern with the impact of the majority's conclusion on the future of redistricting in Illinois. Article XIV, section 3, was included in our constitution to provide the people of this state with the power to act in situations where it is against the legislature's self interest to do so. Redistricting is clearly such an issue. Those elected have an incentive to draw maps that will help them remain in office. Pursuant to article XIV, section 3, the people of Illinois should have an opportunity to vote on whether the redistricting process controlled by the legislature ought to be amended.

This check against the legislature's self interest is especially important when the issue at hand is one so crucial to our democracy. As I noted fifteen years ago, following the redistricting triggered by the 2000 federal census:

> "In any action involving redistricting, much more is at stake than simply who will control the legislature for the next 10 years. 'If any fundamental principle underlies our American system of government, it is the notion that government exists only to serve the governed.' [Citation.] Today, that fundamental principle is dealt a serious blow." *Cole-Randazzo v. Ryan*, 198 Ill. 2d 233, 248 (2001) (Garman, J., dissenting, joined by Thomas, J.).

I again lamented in *Beaubien v. Ryan* that the court had failed its "duty to ensure that the process that ultimately results in a redistricting map that will represent the people of Illinois for the next decade will be 'equitable, balanced, and fair.' " 198 Ill. 2d 294, 308 (2001) (Garman, J., dissenting, joined by Thomas, J.). The majority opinion fails this duty and deals another serious blow to our fundamental principles.

JUSTICES THOMAS and KARMEIER join in this dissent.


JUSTICE THOMAS, dissenting:

The Illinois Constitution is meant to prevent tyranny, not to enshrine it.

Today, just as a critical election board deadline is about to expire, four members of our court have delivered, as a *fait accompli*, nothing less than the nullification of a critical component of the Illinois Constitution of 1970. In direct contradiction of the clear and unambiguous intention of the people who drafted the constitution and the citizens who voted to adopt it, the majority has irrevocably severed a vital lifeline created by the drafters for the express purpose of enabling later generations of Illinoisans to use their sovereign authority as a check against self-interest by the legislature. When the Reporter of Decisions sends out the majority's disposition, he should include a bright orange warning sticker for readers to paste over article XIV, section 3, of their personal copies of the 1970 Constitution reading, "Out of Service."

The majority's ruling in this case comes at a particularly unfortunate time. In Illinois, as throughout the United States, there is a palpable sense of frustration by voters of every political affiliation that self-perpetuating institutions of government have excluded them from meaningful participation in the political process.

In their wisdom, the drafters of the 1970 Constitution foresaw just this problem and fashioned a clear and specific mechanism to insure that the legislature could never have the upper hand on the people of Illinois, in whose hands the sovereign power of this State rests.

That mechanism is article XIV, section 3. In undertaking our constitutional duties, we, as judges, are obliged to resolve any doubt as to the meaning of that provision in favor of the right of the people to have a voice in government, as the drafters intended. I would honor that obligation and permit the ballot initiative proposed here to go forward. The majority's decision to quash it is no less than the death knell of article XIV, section 3's promise of direct democracy as a check on legislative self-interest.

¶ 62    Today a muzzle has been placed on the people of this State, and their voices supplanted with judicial fiat.

¶ 63    The whimper you hear is democracy stifled.

¶ 64    I join that muted chorus of dissent.

¶ 65    CHIEF JUSTICE GARMAN and JUSTICE KARMEIER join in this dissent.


¶ 66    JUSTICE KARMEIER, dissenting:

¶ 67    The issue in this case is whether the circuit court erred when it held that a redistricting initiative petition submitted by Support Independent Maps (Independent Maps) and supported by the number of signatures required by law may not be placed before Illinois voters at the November 8, 2016, general election because it fails to comply with the requirements of article XIV, section 3, of our state constitution (Ill. Const. 1970, art. XIV, § 3). The circuit court's judgment is before us on direct review after we granted an emergency motion by Independent Maps to transfer the appeal from the appellate court on the grounds that the public interest requires prompt adjudication by this court. See Ill. S. Ct. R. 302(b) (eff. Oct. 4, 2011). Expedited briefing has been completed by the parties. In addition, a coalition of numerous business, consumer and public interest organizations led by the League of Women Voters has been granted leave to file a friend of the court brief in support of Independent Maps pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).[6] The matter is now ready for a decision on the merits. For the reasons that follow, the judgment of the circuit court should be reversed.


¶ 68                                    BACKGROUND

¶ 69    The Illinois Constitution of 1970 provides three methods by which it may be amended: constitutional convention (Ill. Const. 1970, art. XIV, § 1); "[a]mendments by General Assembly" (Ill. Const. 1970, art. XIV, § 2); and ballot initiatives (Ill. Const. 1970, art. XIV, § 3). Unlike the first two methods, ballot initiatives may only be used for amendments directed at "structural and procedural subjects contained in Article IV" of the constitution (Ill. Const.

---

[6]The specific organizations joining with the League of Women Voters in this proceeding are the Small Business Advocacy Council Illinois, Illinois Campaign for Political Reform, CHANGE Illinois, Champaign County Chamber of Commerce, McCormick Foundation, Union League Club of Chicago, West Rogers Park Community Organization, Illinois Farm Bureau, Better Government Association, Chicago Southside Branch NAACP, Independent Voters of Illinois-Independent Precinct Organization, Rockford Chamber of Commerce, Naperville Area Chamber of Commerce, Illinois Chamber of Commerce, Chicagoland Chamber of Commerce, Metropolitan Planning Council, Business and Professional People for the Public Interest, Latino Policy Forum, Sargent Shriver National Center on Poverty Law, Illinois Public Interest Research Group, Common Cause, Citizen Advocacy Center, the Civic Federation, Commercial Club of Chicago, Chicago Embassy Church, and Illinois Hispanic Chamber of Commerce.

1970, art. XIV, § 3; Ill. Const. 1970, art. IV), a provision which pertains to the legislative branch of our state government. Among these subjects is the process by which legislative and representative districts are redrawn following each federal decennial census. Ill. Const. 1970, art. IV, § 3.

¶ 70    In May 2016, Independent Maps—a "ballot initiative committee" duly organized in accordance with section 9-1.8(e) of the Election Code (10 ILCS 5/9-1.8(e) (West 2014))—filed with the Secretary of State a petition proposing that article IV, section 3, of the Illinois Constitution be amended to replace the current system for redrawing this state's legislative and representative districts with a new one. In its present form, section 3 of article IV (Ill. Const. 1970, art. IV, § 3) provides:

> "(a) Legislative Districts shall be compact, contiguous and substantially equal in population. Representative Districts shall be compact, contiguous, and substantially equal in population.
>
> (b) In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative Districts and the Representative Districts.
>
> If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10. The Commission shall consist of eight members, no more than four of whom shall be members of the same political party.
>
> The Speaker and Minority Leader of the House of Representatives shall each appoint to the Commission one Representative and one person who is not a member of the General Assembly. The President and Minority Leader of the Senate shall each appoint to the Commission one Senator and one person who is not a member of the General Assembly.
>
> The members shall be certified to the Secretary of State by the appointing authorities. A vacancy on the Commission shall be filled within five days by the authority that made the original appointment. A Chairman and Vice Chairman shall be chosen by a majority of all members of the Commission.
>
> Not later than August 10, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.
>
> If the Commission fails to file an approved redistricting plan, the Supreme Court shall submit the names of two persons, not of the same political party, to the Secretary of State not later than September 1.
>
> Not later than September 5, the Secretary of State publicly shall draw by random selection the name of one of the two persons to serve as the ninth member of the Commission.
>
> Not later than October 5, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.
>
> An approved redistricting plan filed with the Secretary of State shall be presumed valid, shall have the force and effect of law and shall be published promptly by the Secretary of State.

The Supreme Court shall have original and exclusive jurisdiction over actions concerning redistricting the House and Senate, which shall be initiated in the name of the People of the State by the Attorney General."

¶ 71 A central feature of the current version of article IV, section 3, is that initial responsibility for formulating a redistricting plan lies with the General Assembly. In the 46 years since the 1970 Constitution was adopted, however, the General Assembly has managed to agree on such a plan and redistrict itself only once, following the most recent federal census. Pub. Act 97-6 (eff. June 3, 2011). Following each of the other four decennial censuses, resort to a redistricting commission has been required. *People ex rel. Scott v. Grivetti*, 50 Ill. 2d 156 (1971); *Schrage v. State Board of Elections*, 88 Ill. 2d 87 (1981); *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 293 (1992); *Cole-Randazzo v. Ryan*, 198 Ill. 2d 233 (2001); *Beaubien v. Ryan*, 198 Ill. 2d 294 (2001).[7] Moreover, in three of the four instances when resort to the redistricting commission has been needed, the commission itself has deadlocked. This has triggered the provision for selection of an additional member to break the tie through the drawing of lots (see *Schrage v. State Board of Elections*, 88 Ill. 2d at 92; *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 277 (1991); *Beaubien v. Ryan*, 198 Ill. 2d at 299), a process which has been strongly criticized by some members of this court (see *People ex rel. Burris v. Ryan*, 147 Ill. 2d at 308-14 (Bilandic, J., dissenting, joined by Clark and Freeman, JJ.) ("[w]e should not hasten to gamble away the government 'of the People, by the People, and for the People' on the turn of a card, roll of the dice, or even random selection")), though it has been upheld against federal constitutional challenge in the federal courts (*Winters v. Illinois State Board of Elections*, 197 F. Supp. 2d 1110 (N.D. Ill. 2001), *aff'd*, 535 U.S. 967 (2002)). In each of the three instances, the resulting map favored the political party with which the winner of the draw was affiliated.

¶ 72 In place of the current provision, the amendment to article IV, section 3, proposed by Independent Maps would substitute an entirely new section 3. Under the new section 3, the framework of the redistricting process would be fundamentally restructured. The General Assembly, as an institution, would be removed completely from the redistricting process. Instead, primary responsibility for redrawing legislative and representative districts would lie with a new "Independent Redistricting Commission," whose members are selected through a process in which legislative leaders have only limited input and which, among other things, eliminates the drawing of lots to break deadlocks.

¶ 73 The new system is not unlike the one adopted through a citizen initiative in Arizona with the hope of "ending the practice of gerrymandering and improving voter and candidate participation in elections" (internal quotation marks omitted) (*Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. ___, 135 S. Ct. 2652, 2661 (2015)) and

---

[7]The legislative redistricting commission formed after the General Assembly failed to pass a redistricting bill following the 1970 census was ultimately determined by this court to have been illegally constituted, but the redrawn map it formulated was nevertheless adopted by our court as a "provisional" plan for use in 1972, with instructions that a "redistricting plan for subsequent elections shall be adopted pursuant to the procedures outlined in section 3 of article IV of the 1970 constitution of this State." *People ex rel. Scott v. Grivetti*, 50 Ill. 2d at 168. When the General Assembly revisited the matter, it simply adopted the same map formulated by the commission and approved by the court. See Pub. Act 78-42 (eff. June 30, 1973); Robert M. Rogers, *Illinois Redistricting History Since 1970*, 3 Illinois General Assembly Legislative Research Unit Research Response (2008).

recently upheld by the United States Supreme Court against a federal constitutional challenge (*id.* at ___, 135 S. Ct. at 2661). Specifically, the provision proposed by Independent Maps provides as follows:

"(a) The Independent Redistricting Commission comprising 11 Commissioners shall adopt and file with the Secretary of State a redistricting plan for Legislative Districts and Representative Districts by June 30 of the year following each Federal decennial census. Legislative Districts shall be contiguous and substantially equal in population. Representative Districts shall be contiguous and substantially equal in population. The redistricting plan shall comply with Federal law. Subject to the foregoing, the Commission shall apply the following criteria: (1) the redistricting plan shall not dilute or diminish the ability of a racial or language minority community to elect the candidates of its choice, including when voting in concert with other persons; (2) the redistricting plan shall respect the geographic integrity of units of local government; and (3) the redistricting plan shall respect the geographic integrity of communities sharing common social and economic interests, which do not include relationships with political parties or candidates for office. The redistricting plan shall not either intentionally or unduly discriminate against or intentionally or unduly favor any political party, political group or particular person. In designing the redistricting plan, the Commission shall consider party registration and voting history data only to assess compliance with the requirements in this subsection (a).

(b) For the purpose of conducting the Commissioner selection process, an Applicant Review Panel comprising three Reviewers shall be chosen in the following manner. Beginning not later than January 1 and ending not later than March 1 of the year in which the Federal decennial census occurs, the Auditor General shall request and accept applications to serve as a Reviewer. The Auditor General shall review all applications and select a pool of 30 potential Reviewers. The Auditor General should select applicants for the pool of potential Reviewers who would operate in an ethical and non-partisan manner by considering whether each applicant is a resident and registered voter of the State and has been for the four years preceding his or her application, has demonstrated understanding of and adherence to standards of ethical conduct and has been unaffiliated with any political party for the three years preceding appointment. By March 31 of the year in which the Federal decennial census occurs, the Auditor General shall publicly select by random draw the Panel of three Reviewers from the pool of potential Reviewers.

(c) Beginning not later than January 1 and ending not later than March 1 of the year in which the Federal decennial census occurs, the Auditor General shall request and accept applications to serve as a Commissioner on the Independent Redistricting Commission. By May 31, the Panel shall select a pool of 100 potential Commissioners. The Panel should select applicants for the pool of potential Commissioners who would be diverse and unaffected by conflicts of interest by considering whether each applicant is a resident and registered voter of the State and has been for the four years preceding his or her application, as well as each applicant's prior political experience, relevant analytical skills, ability to contribute to a fair redistricting process and ability to represent the demographic and geographic diversity of the State. The Panel shall act by affirmative vote of two Reviewers. All records of the Panel, including applications

to serve on the Panel, shall be open for public inspection, except private information about applicants for which there is no compelling public interest in disclosure.

(d) Within 45 days after the Panel has selected the pool of 100 potential Commissioners, but not later than June 23 of the year in which the Federal decennial census occurs, the Speaker and Minority Leader of the House of Representatives and the President and Minority Leader of the Senate each may remove up to five of those potential Commissioners. Thereafter, but not later than June 30, the Panel shall publicly select seven Commissioners by random draw from the remaining pool of potential Commissioners; of those seven Commissioners, including any replacements, (1) the seven Commissioners shall reside among the Judicial Districts in the same proportion as the number of Judges elected therefrom under Section 3 of Article VI of this Constitution, (2) two Commissioners shall be affiliated with the political party whose candidate for Governor received the most votes cast in the last general election for Governor, two Commissioners shall be affiliated with the political party whose candidate for Governor received the second-most votes cast in such election and the remaining three Commissioners shall not be affiliated with either such political party and (3) no more than two Commissioners may be affiliated with the same political party. The Speaker and Minority Leader of the House of Representatives and the President and Minority Leader of the Senate each shall appoint one Commissioner from among the remaining applicants in the pool of potential Commissioners on the basis of the appointee's contribution to the demographic and geographic diversity of the Commission. A vacancy on the Panel or Commission shall be filled within five days by a potential Reviewer or potential Commissioner from among the applicants remaining in the pool of potential Reviewers or potential Commissioners, respectively, in the manner in which the office was previously filled.

(e) The Commission shall act in public meetings by affirmative vote of six Commissioners, except that approval of any redistricting plan shall require the affirmative vote of at least (1) seven Commissioners total, (2) two Commissioners from each political party whose candidate for Governor received the most and second[-]most votes cast in the last general election for Governor and (3) two Commissioners not affiliated with either such political party. The Commission shall elect its chairperson and vice chairperson, who shall not be affiliated with the same political party. Six Commissioners shall constitute a quorum. All meetings of the Commission attended by a quorum, except for meetings qualified under attorney-client privilege, shall be open to the public and publicly noticed at least two days prior to the meeting. All records of the Commission, including communications between Commissioners regarding the Commission's work, shall be open for public inspection, except for records qualified under attorney-client privilege. The Commission shall adopt rules governing its procedure, public hearings and the implementation of matters under this Section. The Commission shall hold public hearings throughout the state both before and after releasing the initial proposed redistricting plan. The Commission may not adopt a final redistricting plan unless the plan to be adopted without further amendment, and a report explaining its compliance with this Constitution, have been publicly noticed at least seven days before the final vote on such plan.

(f) If the Commission fails to adopt and file with the Secretary of State a redistricting plan by June 30 of the year following a Federal decennial census, the Chief Justice of the Supreme Court and the most senior Judge of the Supreme Court who is not affiliated with the same political party as the Chief Justice shall appoint jointly by July 31 a Special Commissioner for Redistricting. The Special Commissioner shall adopt and file with the Secretary of State by August 31 a redistricting plan satisfying the requirements set forth in subsection (a) of this Section and a report explaining its compliance with this Constitution. The Special Commissioner shall hold at least one public hearing in the State before releasing his or her initial proposed redistricting plan and at least one public hearing in a different location in the State after releasing his or her initial proposed redistricting plan and before filing the final redistricting plan with the Secretary of State. All records of the Special Commissioner shall be open for public inspection, except for records qualified under attorney-client privilege.

(g) An adopted redistricting plan filed with the Secretary of State shall be presumed valid and shall be published promptly by the Secretary of State.

(h) The Supreme Court shall have original jurisdiction in cases relating to matters under this Section."

¶ 74 As noted earlier, the proponent of this amendment, Independent Maps, petitioned to bring it before the voters for approval using the ballot initiative process in article XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. XIV, § 3). Article XIV, section 3, requires that petitions to amend article IV be signed by "a number of electors equal in number to at least eight percent of the total votes cast for candidates for Governor in the preceding gubernatorial election." Ill. Const. 1970, art. XIV, § 3. In this case, that number was 290,216. Independent Maps' petition was signed by 563,974 people. The State Board of Elections determined that at least 375,613 of those signatures were valid. The petition therefore surpassed the signature requirement necessary for it to be placed before the voters.

¶ 75 On May 11, 2016, five days after Independent Maps submitted its petition to the State Board of Elections, a "taxpayer's suit" was filed in the circuit court of Cook County pursuant to section 11-303 of the Code of Civil Procedure (735 ILCS 5/11-303 (West 2014)) to restrain and enjoin the State Board of Elections and various other governmental agencies and officers from disbursing public funds to determine whether the petition complies with the Election Code (10 ILCS 5/1-1 et seq. (West 2014)) or to place the proposed amendment on the ballot for consideration at the upcoming General Election in November 2016. Declaratory relief was also requested.[8]

---

[8]There is no dispute that a taxpayer action for declaratory and injunctive relief is an appropriate vehicle for challenging the constitutionality of a proposed ballot initiative, nor is there any question that the matter is ripe for consideration notwithstanding the fact that the State Board of Elections has not yet officially declared Independent Maps' petition valid nor certified the initiative for inclusion on the ballot for the November election. Aside from the constitutional challenge mounted by plaintiffs, there do not appear to be any impediments to placing the proposed amendment before the voters. Any additional steps the Board of Elections must take to complete the process are purely administrative. See *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 506-07 (1994), agreeing with the dissent (*id.* at 515-16 (Harrison, J., dissenting, joined by Miller and Heiple, JJ.)).

¶ 76    The action was brought in the name of a political committee called People's Map; the chairperson of People's Map, John Hooker; Frank Clark, president and chairperson of an organization known as the Business Leadership Council; various individual members of the Business Leadership Council; and the leaders of four different ethnic, cultural, business and community groups, all of whom were alleged to be Illinois residents and taxpayers. In addition to the Board of Elections and its chairperson and members, the complaint named as defendants Leslie Munger, the State Comptroller; Jesse White, the Secretary of State; Michael Frerichs, the State Treasurer; David Orr, the County Clerk of Cook County; and the Board of Election Commissioners for the City of Chicago, its chairperson, and members. By agreed order, Orr and the Chicago Board of Election Commissioners, its chair and members were later dismissed from the case without prejudice. They are no longer part of these proceedings.

¶ 77    Independent Maps was not included as a party. Shortly after the action was filed, however, it sought and was granted leave to intervene. See 735 ILCS 5/2-408 (West 2014). The organization's intervention in support of its proposed ballot initiative has ample precedent in our case law (see *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 506 (1994) (*per curiam*) (hereinafter *CBA II*); *Chicago Bar Ass'n v. State Board of Elections*, 137 Ill. 2d 394, 396 (1990) (hereinafter *CBA I*); *Coalition for Political Honesty v. State Board of Elections*, 65 Ill. 2d 453, 456 (1976) (*per curiam*) (hereinafter *Coalition I*)) and has not been questioned.

¶ 78    Plaintiffs' complaint contained 11 counts. Counts I through VI were directed against all defendants, and all sought a declaratory judgment that the amendment to article IV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 3) proposed by Independent Maps is unconstitutional because it exceeds the scope of ballot initiatives permitted under article XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. XIV, § 3).

¶ 79    As noted earlier, article XIV, section 3, specifies that amendments using the ballot initiative procedure "shall be limited to structural and procedural subjects contained in Article IV [Ill. Const. 1970, art. IV, § 3]," the legislative article. Ill. Const. 1970, art. XIV, § 3. Count V of plaintiffs' complaint construed this provision as limiting the use of the ballot initiative process to changes to the actual structure and procedure of the General Assembly itself. Because Independent Maps' proposal is addressed to redistricting and not how the General Assembly is organized or "the process by which it adopts a law," plaintiffs contended that it falls outside the parameters of article XIV, section 3, and is impermissible.

¶ 80    Counts I through IV and VI alleged, in the alternative, that even if redistricting does qualify as one of the "structural and procedural subjects contained in Article IV" within the meaning of article XIV, section 3, the proposed ballot initiative is nevertheless invalid because it is not "limited" to those subjects as article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), requires. According to count I, the initiative goes beyond the requisite limit by imposing additional duties on the Auditor General beyond those specified in article VIII of the Illinois Constitution (Ill. Const. 1970, art. VIII, § 3), which creates the office. Count II alleged that the initiative is unconstitutional because it would alter the jurisdiction of the courts as specified in the judicial article of the Illinois Constitution (Ill. Const. 1970, art. VI). Count III complained that the initiative cannot proceed because, if adopted, it would impose new duties on the Chief Justice of this court and the most senior Justice who is not affiliated with the same political party as the Chief Justice. Count IV contended that the proposed initiative is fatally infirm because it would

- 23 -

require members of this court to be affiliated with a political party when no such requirement currently exists under the constitution. Count VI argued that the initiative goes beyond the permissible limits of ballot initiatives by removing the power currently held by the Attorney General to initiate actions concerning legislative redistricting.

¶ 81　　Count VII also sought a declaratory judgment against all defendants. Unlike the previous six counts, however, Count VII did not allege a violation of article XIV, section 3. Rather, it called for rejection of Independent Maps' ballot initiative on the grounds that it violates a different provision of our state's constitution, namely, article III, section 3 (Ill. Const. 1970, art. III, § 3). Article III, section 3, provides that "[a]ll elections shall be free and equal." Ill. Const. 1970, art. III, § 3. Plaintiffs asserted that Independent Maps' ballot initiative contravenes that requirement by impermissibly combining separate and unrelated questions into a single ballot proposition.

¶ 82　　Counts VIII through XI advanced no additional substantive grounds for challenging the validity of Independent Maps' ballot initiative. They merely incorporated by reference the allegations in the prior counts and, rather than seeking declaratory relief, requested a permanent injunction to prevent the various defendant agencies and officials from disbursing any more public funds to assess the sufficiency of Independent Maps' petition or to place the measure on the ballot for consideration by the voters at the November 8, 2016, general election. Count VIII was directed against the State Board of Elections, its officers, and members. Count IX was directed at the Board of Election Commissioners for the City of Chicago and its officers and members as well as the County Clerk of Cook County. As noted earlier, these defendants were later dismissed from the case. Correspondingly, count IX was stricken and is no longer at issue. Count X was directed at the Comptroller and State Treasurer. Count XI sought to enjoin the Secretary of State.

¶ 83　　On May 20, 2016, following the requisite notice and hearing, the circuit court entered an order allowing plaintiffs leave to file their complaint. Independent Maps promptly filed an answer. A separate, joint answer was also filed by all of the defendant State agencies and their members and the State officials. At the same time, plaintiffs moved for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2014)) asking that the court grant them the declaratory and injunctive relief requested in their complaint. Independent Maps simultaneously filed a cross-motion for judgment on the pleadings arguing that plaintiffs' complaint should be dismissed with prejudice.

¶ 84　　The circuit court conducted a hearing on the parties' respective motions on June 30, 2016. Approximately three weeks later, it granted plaintiffs' motion with respect to counts I through VII, which sought declaratory relief, and denied Independent Maps' motion with respect to those same seven counts, agreeing with plaintiffs that the proposed ballot initiative failed to meet constitutional requirements. Because the parties had apparently not briefed the question of whether injunctive relief should be entered, the court entered no judgment as to the three remaining counts still left in the case, VIII, X, and XI, all of which had sought such relief. To prevent the absence of a judgment as to those counts from impeding immediate review, the court made an express written finding pursuant to Illinois Supreme Court Rule 304(a) that there was no just reason for delaying enforcement or appeal of its judgment. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 85        Independent Maps filed an immediate appeal to the appellate court and requested that the matter be placed on an accelerated docket. See Ill. S. Ct. R. 311(b) (eff. Mar. 8, 2016). It then moved to transfer the case to this court pursuant to Illinois Supreme Court Rule 302(b) (eff. Oct. 4, 2011), which provides for such transfers when the public interest requires prompt adjudication of the matter by the Illinois Supreme Court. We allowed that motion on July 22, 2016, ordered that the appeal be taken directly to us, and set an expedited briefing schedule for the parties. We also permitted a coalition consisting of the League of Women Voters and more than two dozen other business, civic, and public interest groups to file an *amicus* brief in support of Independent Maps. All briefs have now been received, and the matter has been taken under submission without oral argument.

¶ 86                                         ANALYSIS

¶ 87        As grounds for its appeal, Independent Maps argues that the circuit court erred in granting judgment on the pleadings in favor of plaintiffs pursuant to section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2014)) and that the court should instead have allowed its cross-motion for judgment on the pleadings and dismissed plaintiffs' complaint with prejudice. The standards guiding our consideration of these arguments are well established. Judgment on the pleadings is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 454 (2010). In ruling on a motion for judgment on the pleadings, a court may consider only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record. All well-pleaded facts and all reasonable inferences from those facts are taken as true. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 385 (2005); *M.A.K. v. Rush-Presbyterian-St. Luke's Medical Center*, 198 Ill. 2d 249, 255 (2001). We review the grant of judgment on the pleadings *de novo*. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d at 454. *De novo* review is also appropriate here because resolution of this case turns on the interpretation and application of the Illinois Constitution, which is a question of law. *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 254-55 (2003).

¶ 88        As set forth earlier in this dissent, plaintiffs have advanced two basic lines of constitutional attack against Independent Maps' ballot initiative: (1) that it exceeds the scope of amendments permitted through ballot initiative under article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), because it is not "limited to structural and procedural subjects contained in Article IV," our constitution's legislative article (counts I through VI of plaintiffs' complaint) and (2) that it violates article III, section 3, of the constitution, which provides that "[a]ll elections shall be free and equal" (Ill. Const. 1970, art. III, § 3), because it impermissibly combines into a single ballot proposition separate and unrelated questions (count VII of plaintiffs' complaint). Contrary to the view taken by the circuit court and adopted by the majority, neither argument can be sustained.

¶ 89        I will begin with plaintiffs' challenge under article III, section 3 (Ill. Const. 1970, art. III, § 3), the so-called "free and equal" clause. This clause, which was also included in the Illinois Constitution of 1870 (Ill. Const. 1870, art. II, § 18), has been construed by our court as requiring, among other things, "that separate and independent questions may not be combined in one [ballot] proposition in such a way as to place a voter in the position of having to vote for

- 25 -

or against both questions when he [or she] might otherwise favor one but oppose the other." *Village of Deerfield v. Rapka*, 54 Ill. 2d 217, 223 (1973). When applying this clause in the context of ballot initiatives, we have been careful to point out that the simple fact that a proposition may touch on multiple issues will not render it improper for "free and equal" purposes. *Id.* at 224. Nearly any proposition, after all, could be broken into simpler questions. *Coalition for Political Honesty v. State Board of Elections*, 83 Ill. 2d 236, 258 (1980) (*per curiam*) (hereinafter *Coalition II*). If inclusion of multiple components were sufficient, in itself, to render a proposal fatally infirm under the "free and equal" clause, the ability of the people of our State to exercise their right to change the law through ballot measures would therefore be significantly compromised. That is therefore not the test. Rather, our precedent makes clear that "free and equal" election concerns are triggered only if the ballot initiative seeks to combine in a single proposition questions that are separate and unrelated. *Id.* at 254.

¶ 90    In evaluating whether or not ballot questions are "separate and unrelated," we have held that multiple questions "may be combined in a single proposition as long as they are reasonably related to a common objective in a workable manner." (Emphasis added.) *Id.* at 254, 256. If the various parts of the proposal have a reasonable, workable relationship to the same subject, if they are germane to the accomplishment of a single objective, the proposal may be submitted for approval or rejection by the voters. *Id.* at 257-58.

¶ 91    Independent Maps' ballot initiative plainly meets this test. It proposes a single question narrowly focused on a single objective: replacing the current system for redistricting set forth in article IV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 3) with the new redistricting system Independent Maps has proposed. All components of the proposition are integrally related to that purpose and no other.

¶ 92    It is true, of course, that the proposed amendment at issue here does touch on a range of matters, including the authority of various State officials and the jurisdiction of this court. As I have just pointed out, however, the mere fact that a proposition may touch on multiple issues does not render it infirm for "free and equal" purposes. The critical inquiry is whether the various components are directed at accomplishing the same objective. In this case, they are.[9]

¶ 93    Indeed, the initiative's components are not only all related to a single, unifying objective, they are also integrally related to one another. They are essential pieces of an overall framework designed to remedy the various problems perceived by the proponents with the current redistricting system. This is an all-in-one, take-it-or-leave-it proposition. And because

_____

[9]In arguing for a contrary conclusion, plaintiffs note, for example, that the amendment proposed by the initiative would eliminate an express reference to compactness when describing the criteria to be followed in the redistricting process. Plaintiffs contend that this change has nothing to do with the purpose of the initiative. That is manifestly incorrect. The purpose of the initiative is to change the current redistricting system, and the criteria that guide how districts are to be determined—something the current version of article IV expressly addresses—are fundamental to that process. Plaintiffs' argument is also flawed because it fails to recognize that criteria (2) and (3) in subsection (a) of the proposal, dealing with the geographic integrity of governmental units and communities sharing common social and economic interests, reflect considerations similar to those underlying the current compactness requirement. Plaintiffs have not cited and I have not found any authority that would support the proposition that a free and equal clause problem is created simply because a ballot initiative expresses a corresponding objective in a different way than the provision it seeks to change.

the proposed new system would operate in a fundamentally different way than the system presently in place, it simply does not lend itself to being implemented in steps. The voters can choose to accept or reject it, but it would make no sense to require them to vote on it in installments.

¶ 94 Putting aside the logistical challenges, which would be formidable, dividing up the proposal's constituent parts for separate consideration by the voters could be disastrous. As Independent Maps has pointed out in its brief,

"[i]t would take numerous separate votes to consider just the procedural issues that plaintiffs claimed *** were 'separate and unrelated'—votes concerning the role of the Auditor General, the role of the Supreme Court, the role of the Attorney General, and the basic Independent Commission structure. If the provisions regarding the Auditor General failed, there would be no coherent process for choosing the Independent Redistricting Commission. And if the provisions regarding the Supreme Court failed, there would be no back-up mechanism in the event the Commission could not agree."

The result could well be a hybrid system that no one wanted, that no one had ever suggested, and that could not possibly work. The confusion and uncertainty in the electoral process that would follow from such a development is manifest.

¶ 95 Decades ago we held the combination of related questions in a single proposition is not constitutionally prohibited where presentation of the questions separately might yield incongruous results and create uncertainty and confusion through a "legislature in an intermediate stage of development." See *Coalition II*, 83 Ill. 2d at 255. For the reasons just described, that would certainly be the case here.

¶ 96 Finally, I note that to the extent the amendment proposed by Independent Maps may be complex, it is because the very process the amendment seeks to change is itself complex. The redistricting mechanism set forth in article IV, section 3 (Ill. Const. 1970, art. IV, § 3), is an elaborate one containing multiple steps and involving members of all three branches of government. Alternative redistricting measures cannot be substituted without touching on these same areas, and the terms of the amendment are no more varied or wide-ranging than the terms of the current redistricting rules set out in the version of article IV, section 3, presently in force. To hold that the multifaceted nature of the proposal dooms it under the "fair and equal" clause of the Illinois Constitution would, under these circumstances, be tantamount to holding that the provisions of section 3 of the legislative article of our constitution (Ill. Const. 1970, art. IV, § 3) are not subject to amendment through the ballot initiative notwithstanding the express authorization to use the ballot initiative process to amend the legislative article, which the people of Illinois reserved for themselves under article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), when they ratified the 1970 Constitution. In effect, the constitution's provisions for amendment of the legislative article through the ballot initiative process would be nullified by the constitution's "free and equal" clause.

¶ 97 This is a construction of the law we cannot countenance. It is incumbent upon us to give meaning to every section and clause of the constitution, and whenever different parts of the constitution might appear to be in conflict, it is our obligation to harmonize them, if practicable. One clause will not be allowed to defeat another if by any reasonable construction the two can be made to stand together. *Oak Park Federal Savings & Loan Ass'n v. Village of Oak Park*, 54 Ill. 2d 200, 203 (1973). I would therefore hold that the circuit court erred when it

granted judgment for the pleadings in favor of plaintiffs and against Independent Maps on count VII of plaintiff's complaint alleging violation of the "free and equal" clause. That count should have been dismissed.

¶ 98    I turn then to counts I through VI of plaintiffs' complaint. Those counts, as described earlier, were directed against all defendants, and all sought a declaratory judgment that the amendment to article IV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 3) proposed by Independent Maps in its ballot initiative is not valid and should not be placed before the voters because it does not fall within the scope of initiative measures permitted by article XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. XIV, § 3).

¶ 99    Article XIV, section 3, specifies, in pertinent part:

> "Amendments to Article IV of this Constitution may be proposed by a petition signed by a number of electors equal in number to at least eight percent of the total votes cast for candidates for Governor in the preceding gubernatorial election. Amendments shall be limited to structural and procedural subjects contained in Article IV. *** If the petition is valid and sufficient, the proposed amendment shall be submitted to the electors at that general election and shall become effective if approved by either three-fifths of those voting on the amendment or a majority of those voting in the election." Ill. Const. 1970, art. XIV, § 3.

¶ 100    The parties agree that the viability of counts I through VI of plaintiffs' complaint turns solely on the question of how the provisions of article XIV, section 3, should be construed. In general, when construing the provisions of the Illinois Constitution, we apply the same principles applicable to the construction of statutes. *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 526 (1990). Our objective when construing a constitutional provision is to determine and effectuate the common understanding of the citizens who adopted it. In doing so, we will look to the natural and popular meaning of the language used as it was understood when the constitution was adopted, as well as " 'the object to be attained or the evil to be remedied.' " *Walker v. McGuire*, 2015 IL 117138, ¶ 16 (quoting *People ex rel. Chicago Bar Ass'n*, 136 Ill. 2d at 526). If the language of a constitutional provision is unambiguous, we will give it effect without resort to other aids for construction. When the meaning of a provision is not clear from its language, however, "we will consult the drafting history of the provision, including the debates of the delegates to the constitutional convention." *Id.*

¶ 101    Illinois courts have grappled with the language of article XIV, section 3, on multiple occasions since the 1970 Constitution was adopted. Unlike the majority here, they have not found its meaning clear and unambiguous. To the contrary, in each instance, resort to the history of the provision, including the debates at the constitutional convention regarding its meaning and purpose, has been necessary. See *Coalition I*, 65 Ill. 2d 453; *Coalition II*, 83 Ill. 2d 236; *Lousin v. State Board of Elections*, 108 Ill. App. 3d 496 (1982); *CBA I*, 137 Ill. 2d 394 (1990); *CBA II*, 161 Ill. 2d 502. This case is no different.

¶ 102    Most lawmaking in the United States occurs through representative bodies elected by the people. Direct lawmaking by the people themselves was virtually nonexistent at the time the United States Constitution was drafted. It did not gain a foothold in our country until the turn of the twentieth century. Since then, two principal forms of direct legislation have been adopted, the initiative and the referendum. The referendum serves as a negative check on action by the

legislature, allowing the voters to petition to refer legislative action to the voters for approval or rejection at the polls. The initiative, by contrast, allows the voters to adopt positive legislation independently of their state's representative assemblies by petitioning to place proposed statutes or constitutional amendments directly before their fellow voters for adoption or rejection at the polls. It has been said that the referendum corrects sins of commission by elected representative bodies, while the initiative corrects the sins of omission by such bodies. *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2659-60.

¶ 103    For most of this state's history, the initiative process could not be used to amend our constitution. Originally, the only way the constitution could be changed was by convening a constitutional convention. Ill. Const. 1818, art. IV, § 2. Eventually a second method was added under which amendments could also be proposed by the General Assembly for approval by the voters. Lawrence Schlam, *State Constitutional Amending, Independent Interpretation, and Political Culture: A Case Study in Constitutional Stagnation*, 43 DePaul L. Rev. 269, 326 (1994). It was not until the Sixth Illinois Constitutional Convention in 1970 that amending the constitution through a direct ballot initiative was proposed as a third alternative. *CBA I*, 137 Ill. 2d at 398.

¶ 104    Although the initiative does not have a counterpart in the federal constitution, the United States Supreme Court has recognized that

"invention of the initiative was in full harmony with the Constitution's conception of the people as the font of governmental power. As Madison put it: 'The genius of republican liberty seems to demand . . . not only that all power should be derived from the people, but that those intrusted with it should be kept in dependence on the people.' [The Federalist], No. 37, at 223.

The people's ultimate sovereignty had been expressed by John Locke in 1690, a near century before the Constitution's formation:

'[T]he Legislative being only a Fiduciary Power to act for certain ends, there remains still in the People a Supream [*sic*] Power to remove or alter the Legislative, when they find the Legislative act contrary to the trust reposed in them. For all Power given with trust for the attaining an end, being limited by that end, whenever that end is manifestly neglected, or opposed, the trust must necessarily be forfeited, and the Power devolve into the hands of those that gave it, who may place it anew where they shall think best for their safety and security.' Two Treatises of Government § 149, p. 385 (P. Laslett ed. 1964).

Our Declaration of Independence, ¶2, drew from Locke in stating: 'Governments are instituted among Men, deriving their just powers from the consent of the governed.' And our fundamental instrument of government derives its authority from 'We the People.' U. S. Const., Preamble. As this Court stated, quoting Hamilton: '[T]he true principle of a republic is, that the people should choose whom they please to govern them.' *Powell* v. *McCormack*, 395 U. S. 486, 540-541 (1969) (quoting 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876))." *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2674-75.

¶ 105    Our court recently addressed these principles in the context of Illinois government. In *In re Pension Reform Litigation*, 2015 IL 118585, ¶¶ 77-78, we explained:

"Unlike Great Britain, where the sovereignty of the nation resides in Parliament, '[u]nder our institutions this sovereignty or transcendent power of government resides in or with the people.' *Hawthorn v. People*, 109 Ill. 302, 305-06 (1883). See 33A Ill. L. and Prac. *State Government* § 3 (2012). Sovereignty is lodged in the people (*People ex rel. Dickinson v. Board of Trade*, 193 Ill. 577, 589 (1901)), and the people are the sovereign power (*Field v. People ex rel. McClernand*, 3 Ill. 79, 110-11 (1839)). The people therefore possess all power originally, including all legislative power. *Harder's Fire Proof Storage & Van Co. v. City of Chicago*, 235 Ill. 58, 68 (1908).

As the ultimate sovereign, the people can, 'within constitutional restrictions imposed by the Federal constitution, delegate the powers of government to whom and as they please. They can withhold or [e]ntrust it, with such limitations as they choose.' *Hawthorn v. People*, 109 Ill. at 306; accord *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 672 (1976) ('all power derives from the people' who can delegate it to representative instruments which they create or reserve to themselves the power to deal directly with matters which might otherwise be assigned to the legislature). *** *Munn v. Illinois*, 94 U.S. 113, 124 (1876)."

¶ 106 The drafters of the 1970 Illinois Constitution acted in accordance with these principles when they formulated the initiative provision set forth in article XIV, section 3. In some jurisdictions, the initiative power is broad. Under the Arizona Constitution, for example, any law that may be enacted by the legislature may be enacted by the people directly through the initiative process. *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2660-61. Article XIV, section 3, which was ratified by the people of our state, is more focused. It pertains specifically to changes to the constitution's legislative article, article IV. The reason for this, as we noted more than 30 years ago, is that "[t]he majority of delegates [to the Convention] appear to have believed that legislative reform presented unique problems and required a special provision." *Coalition II*, 88 Ill. 2d at 244.

¶ 107 In the course of the convention's debate regarding the desirability and scope of ballot initiatives, Delegate Perona elaborated:

"[O]ne important area in which I think [initiatives] would be very beneficial would be in regard to the legislative article. I am convinced, from serving on the Legislative Committee, that neither by the process of legislative amendments or by the process of Constitutional Convention are we going to get any substantial change in our present legislative article. Now whether we need change or not, I am not arguing that point. But sometime, possibly, in the next 100 years, we may need some change in the legislative article; and if we are dependent upon an amendment suggested by the legislature to reduce its size or to abolish cumulative voting or possibly to change to a unicameral legislature, I don't think we are going to get it done. I would also feel that it is unlikely that the Constitutional Convention—because of its ties, in many cases, or obligations to members of the legislature and in saying these things, I am not being critical of the legislature or of any of its members; I just think we have to recognize that all of us are affected by our point of view, and that this is a necessary and inherent ingredient in human nature. And so if we are to leave open the possibility of effective change in the legislative article, I think we have to have something like the initiative ***." 2 Record of Proceedings, Sixth Illinois Constitutional Convention 583 (hereinafter Proceedings).

¶ 108     During the same discussion, Delegate Garrison followed the foregoing observations with similar points bearing even more directly on the issue at hand in this case. He stated:

> "The initiative would provide a safety valve through which the people may act directly if sufficiently aroused. It would furnish a salutary effect on the legislature. For example, we could hardly expect the legislature *ever* to propose a Constitutional amendment to reduce the size of its membership, **to establish a reapportionment commission comprised entirely of nonlegislative members**, or perhaps even to establish single-member districts." (Italics in original, bold added for emphasis.) 2 Proceedings 584.

¶ 109     The specific provision which would ultimately become article XIV, section 3, was addressed by Delegate Perona later in the convention. He stated that the purpose of this provision, which he described as providing for "initiatives limited to the legislative article," were as follows:

> "One, to give the people an opportunity to participate in government, but on a limited basis in an attempt to prevent some of the abuses that have occurred in some areas. ***
>
> This provision has been structured to apply only to the legislative article and to be limited to the area of government which it is most likely will not be changed in the constitution by amendment. The legislature, being composed of human beings, will be reluctant to change the provisions of the constitution that govern its structure and makeup ***.
>
> *** [A]nd also I think the General Assembly will be more—have its ear tuned to a greater degree as to what the people desire, because they will know that if they do not suggest amendments that the people would desire, that it can be done in another manner ***." 4 Proceedings 2911.

¶ 110     When the convention's Committee on the Legislature subsequently made its report on what became article XIV, section 3, it echoed those sentiments. The report explained:

> "The primary reason for offering a limited constitutional initiative proposal for the Legislative Article is quite simple: members of the General Assembly have a greater vested interest in the legislative branch of government than any other branch or phase of governmental activity.
>
> Cognizant of this fundamental fact of life, the Legislative Committee proposes that the people of the State of Illinois reserve the right to propose amendments by the initiative process to the Legislative Article. ***
>
> In addition to this primary reason for proposing a limited form of Constitutional initiative, the Legislative Committee believes:
>
> —(1) the greatest virtue in having this provision rests in the potential for keeping the General Assembly more responsive on matters directly and vitally affecting them;
>
> —(2) voters can better decide on the merits of proposals suggesting changes in the Legislative Article since they are not directly and personally involved; and
>
> —(3) this is a method to circumvent a legislature which might be dominated by interests opposing legislative changes." 6 Proceedings 1399-1400 (quoted in *Coalition II*, 83 Ill. 2d at 245).

¶ 111　　In sum, article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), "was drafted and adopted as a check on the legislature's self-interest" (*Coalition II*, 83 Ill. 2d at 247) and a means by which the people could overcome " 'a reluctance on the part of the General Assembly to propose changes in its own domain' " (*id.* at 246 (quoting 7 Proceedings 2677-78)). Our forefathers emphasized the importance of structuring the legislative branch of government so as to support in the members " 'an habitual recollection of their dependence on the people.' " *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2677 (quoting James Madison, The Federalist No. 57, at 350). Article IV, section 3, of the Illinois Constitution and article XIV, section 3, through which article IV may be amended, directly serve that critical goal.

¶ 112　　When courts are called upon to intervene in the initiative process, as we have been here, "they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." *Committee for a Healthy Future, Inc. v. Carnahan*, 201 S.W.3d 503, 507 (Mo. 2006) (*en banc*). The need for caution and restraint may be especially compelling in cases such as this one, challenging an initiative related to legislative redistricting, for it is a core principle of republican government " 'that the voters should choose their representatives, not the other way around.' " *Arizona State Legislature*, 576 U.S. at ___, 135 S. Ct. at 2677 (quoting Mitchell N. Berman, *Managing Gerrymandering*, 83 Tex. L. Rev. 781 (2005)).

¶ 113　　Consistent with the foregoing principles, our court has previously held that when interpreting and applying articles IV, section 3, and XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 3; art. XIV, § 3), we must avoid unduly technical and/or restrictive constructions that would tend to defeat their purpose. Rather, those provisions "are to be construed so as to effectuate the basic purpose of article XIV, section 3, to provide a workable initiative scheme unfettered by restraints which unnecessarily inhibit the rights which article XIV confers." *Coalition II*, 83 Ill. 2d at 247.

¶ 114　　When the court first adopted this standard in 1980, we noted that the initiative procedure was then relatively new to Illinois and that there were no Illinois cases directly on point. We therefore looked to relevant authority from sister states, as we frequently do in such circumstances. In developing the standard, we cited, with approval, decisions from other jurisdictions that had "carefully protected constitutionally provided initiative plans from unnecessarily burdensome legislative restrictions." *Id.* at 248. Our decision quoted at length an earlier opinion from the Supreme Court of Oklahoma, *In re Initiative Petition No. 23, State Question No. 38*, 127 P. 862, 866 (Okla. 1912), which admonished " '[t]he right of direct legislation in the people must be administered by the officers charged with that duty in such manner as to make it operative. If technical restrictive constructions are placed upon the laws governing the initiation and submission of these measures, the purpose and policy of the people in establishing the same will be entirely defeated ***.' " *Coalition II*, 83 Ill. 2d at 249. Decisions from Nebraska and Arizona to similar effect were also invoked. *Id.* at 248-50.

¶ 115　　The standard is a liberal one. Courts from Maine to Michigan to Hawaii have so recognized when interpreting constitutional provisions applicable to the initiative process in their respective states. *League of Women Voters v. Secretary of State*, 683 A.2d 769, 771 (Me. 1996) ("[w]hen the people enact legislation by popular vote, we construe the citizen initiative provisions of the Maine Constitution liberally in order to facilitate the people's exercise of their sovereign power to legislate"); *Welch Foods, Inc. v. Attorney General*, 540 N.W.2d 693,

695 (Mich. Ct. App. 1995) ("[i]nitiative provisions are liberally construed to effectuate their purposes and facilitate rather than hamper the exercise of reserved rights by the people"); *Ruggles v. Yagong*, 353 P.3d 953, 969 (Haw. 2015) ("direct democracy and the initiative process have had considerable influence on public policy, and they remain as one of the most precious rights of our democratic process. In order to protect this fundamental democratic right, 'courts are required to liberally construe [the initiative process] and accord it extraordinarily broad deference' "). Other decisions to the same effect are legion. See, *e.g.*, *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999); *Blocker v. Sewell*, 75 S.W.2d 658, 660 (Ark. 1934); *Pedersen v. Bennett*, 288 P.3d 760, 762 (Ariz. 2012); *Marblehead v. City of San Clemente*, 277 Cal. Rptr. 550, 553 (Ct. App. 1991); *In re Statement of Sufficiency for 1997-98 # 40 (Medical Use of Marijuana)*, 968 P.2d 112, 118-19 (Colo. 1998) (*en banc*); *Billings v. Buchanan*, 555 P.2d 176, 178 (Colo. 1976) (*en banc*); *Chouteau County v. Grossman*, 563 P.2d 1125, 1128 (Mont. 1977); *Rothenberg v. Husted*, 129 Ohio St. 3d 447, 2011-Ohio-4003, 953 N.E.2d 327, ¶ 5; *State ex rel. Carson v. Kozer*, 217 P. 827, 829 (Or. 1923). Plaintiffs have not cited and I have not found any authority from Illinois or elsewhere holding otherwise.

¶ 116    It is true, of course, that when assessing ballot initiatives, we must keep in mind that if the constitution has placed limitations on the initiative power, such limitations are also an expression of the people's sovereign power and must likewise be obeyed. See *Committee for a Healthy Future, Inc. v. Carnahan*, 201 S.W.3d at 507. Reservation of the right to propose an initiative regarding eligibility to serve as Governor, for example, could scarcely be interpreted as contemplating the right to bring an initiative regarding income tax. With respect to whatever particular sphere or spheres of power the people *have* chosen to reserve for themselves, however, courts must act with deference and restraint to insure that such power may be exercised as the people intended. A contrary view, *i.e.*, that a provision reserving sovereign authority to amend the constitution through initiative must be read in a narrow, technical, and restrictive fashion, would require us to assume that when they reserved their sovereign powers, it was the hope of the people that the courts would prevent them from actually exercising those powers except in the most limited possible way. Such a view is incompatible with the very concept of popular sovereignty under the American constitutional order. It has no foundation in the history or text of the Illinois Constitution of 1970. It is why we have held that the provisions of article XIV, section 3, "are to be construed so as to effectuate the basic purpose of [those provisions], to provide a workable initiative scheme unfettered by restraints which unnecessarily inhibit the rights which article XIV confers." *Coalition II*, 83 Ill. 2d at 247.

¶ 117    Applying the standards our court has established for construing article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), to the present case, I agree with Independent Maps that the circuit court erred when it concluded that plaintiffs were entitled to judgment on the pleadings on counts I through VI of their complaint, which sought a declaratory judgment that the amendment to article IV, section 3 (Ill. Const. 1970, art. IV, § 3), proposed by Independent Maps is unconstitutional because it exceeds the scope of ballot initiatives that article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), permits. Contrary to plaintiffs' contentions, Independent Maps' proposed ballot initiative does conform to article XIV, section 3. Judgment on the pleadings should therefore have been granted in favor of Independent Maps as to counts I through VI of plaintiffs' complaint, just as it should have been granted in favor of Independent Maps with respect to count VII.

¶ 118    The objection asserted in count V of plaintiffs' complaint as to why Independent Maps' proposed ballot initiative fails to meet the requirements of article XIV, section 3, was different from and more basic than the theory they advanced in counts I through IV and VI. I shall therefore consider the viability of that count separately and first.

¶ 119    Count V was premised on the notion that when article XIV, section 3, states that amendments through the initiative process "shall be limited to structural and procedural subjects contained in Article IV," what it really means is that such amendments must pertain to changes to section 1 of Article IV, which specifies that "[t]he legislative power is vested in a General Assembly consisting of a Senate and a House of Representatives, elected by the electors from 59 Legislative Districts and 118 Representative Districts" (Ill. Const. 1970, art. IV, § 3). There is no question that Independent Maps' initiative, if approved, would not alter anything contained in section 1. The power of the General Assembly and how that body is organized by houses and districts would remain unchanged. Plaintiffs asserted that the initiative therefore falls completely outside the scope of article XIV, section 3. Plaintiffs similarly contended in count V of their complaint that to qualify under article XIV, section 3, an initiative must address "the process by which [the legislature] adopts a law." Because Independent Maps' proposal does not do that either, plaintiffs asserted that it is unauthorized for that reason as well.

¶ 120    There is no support for plaintiffs' contentions in either the language or the history of article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3). Article XIV authorizes use of ballot initiatives to amend article IV, the legislative article, with the sole proviso that such initiatives "shall be limited to structural and procedural subjects contained in Article IV." Ill. Const. 1970, art. XIV, § 3. Article IV contains no fewer than fifteen different sections: (1) legislative power and structure, (2) legislative composition, (3) legislative redistricting, (4) election, (5) sessions, (6) organization, (7) transaction of business, (8) passage of bills, (9) veto procedure, (10) effective date of laws, (11) compensation and allowances, (12) legislative immunity, (13) special legislation, (14) impeachment, and (15) adjournment. Under a straightforward reading of article XIV, section 3, *any* structural and procedural subject contained in article IV is eligible for change through a ballot initiative. Article XIV contains no qualifying language that would restrict its applicability only to matters contained in section 1, the provision on which plaintiffs rest their argument, or to the process by which the legislature enacts a law. To so limit it would therefore require us to rewrite article XIV, section 3, to add restrictions that the drafters did not include and the citizens did not approve when the 1970 Constitution was ratified. That, of course, is something we may not do. *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 75.

¶ 121    Plaintiffs seek support for their argument in the title of section 1, which includes the word "structure." I note, however, that if use of the word structure in the title of section 1 meant that section 1 is the sole "structural" subject in article IV, as plaintiffs contend, it would likewise follow that use of the word "procedure" in section 9 (veto procedure) would make the contents of that provision the article's sole "procedural" subject. Plaintiffs, however, make no such argument. To the contrary, and as I have pointed out, they think article XIV, section 3's reference to "procedural" is limited to "the process by which the legislature adopts a law." That subject is covered primarily by section 8 of article IV (Ill. Const. 1970, art. IV, § 8), not section 9. Plaintiffs' position is therefore inconsistent.

- 34 -

¶ 122   More than that, it overlooks basic principles of statutory construction. While an enactment's title can sometimes provide guidance in resolving ambiguities (see *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 40), our interpretation cannot turn on particular words or phrases viewed in isolation. We must construe the enactment as a whole. *In re E.B.*, 231 Ill. 2d 459, 466 (2008).

¶ 123   Even a cursory review of article IV's fifteen sections reveals that structural and procedural matters are not the exclusive province of sections 1 and 9. To the contrary, a full range of matters, from the purely procedural (*e.g.*, the number of times a bill must be read before it may be enacted) to the purely structural (legislative composition), may be found throughout the various provisions of article IV. To limit the reach of article XIV, section 3, in the manner suggested by plaintiffs therefore has no support in the language of the constitution itself.

¶ 124   It is also completely unsupported by the record of the debates at the convention that led to article XIV, section 3's adoption. As presented to the Convention by the Committee on the Legislative Article, article XIV, section 3, addressed "subject matter specifically contained in the Legislative Article [art. IV]" and was targeted at "the basic qualities of the legislative branch—namely, structure, size, organization, procedures, etc." 6 Proceedings 1401. It was not limited to any particular section or sections of the legislative article.

¶ 125   This was intentional. As Delegate Perona explained,

"[W]e intend to limit this to the sections—to the sections presently—the *type* of sections presently in the legislative article. We toyed with the idea or considered the idea of naming the specific sections and limiting it to those; but you run into problems with that, also. *** I think the courts could iron out those questions and protect against abuse." (Emphasis added.) 4 Proceedings 2711.

¶ 126   In response to Perona's remarks, Delegate Tomei stated: "I take it it is not the intention of the committee to limit the initiative just to those things presently contained in the legislative article." *Id.* Delegate Perona answered:

"Yes. That's correct. We—that's the problem. If you get too specific with the limitation, you inhibit the possibility of change within the legislative setup. *** So we've attempted to do it by the explanation as to what our purposes are, and then to leave the question of abuse to the courts." *Id.* at 2711-12.

¶ 127   The delegates then explored the scope of changes that could be accomplished through the initiative process under article XIV, section 3. Adoption of a unicameral legislature was the first example given. Such a change was recognized as falling within the scope of the provision even though it would introduce a new form of organization entirely different from the one in the current legislative article and affect many of the things addressed by the article. Moreover, the scope of the change was identified by Delegate Perona as "the major reason that we could not limit [article XIV, section 3] to certain sections [of the legislative article]." *Id.* at 2712.

¶ 128   Delegate Tomei then asked if the same would be true with a range of other matters, including "apportionment," which was the term initially used in article IV, section 3, to refer to legislative redistricting, and whether those matters would likewise "be subject to initiative under [proposed article XIV, section 3].[10] *Id.* Delegate Perona not only responded in the

_____

[10] The term was changed from apportionment to redistricting at the recommendation of the Committee on Style, Drafting and Submission. 6 Proceedings 1540-44.

affirmative but stated "*[t]hose are the critical areas, actually.*" (Emphasis added.) *Id.* In light of this, there can be no serious question that the drafters of our constitution regarded the redistricting provision of the legislative article to be an altogether proper subject of change through the ballot initiative process.

¶ 129   In urging us to reach a contrary conclusion, plaintiffs invoke this court's prior decision in *CBA II*, 161 Ill. 2d 502. Plaintiffs assert, as they did in the circuit court, that under that decision, redistricting cannot qualify as a structural and procedural subject of article IV and that Independent Maps' proposal does not meet the subject-matter requirement for a ballot initiative set forth in article XIV, section 3, of the Illinois Constitution (Ill. Const. 1970, art. XIV, § 3). The circuit court rejected this contention, and so do I. The initiative at issue in *CBA II* concerned term limits, not redistricting. As I have just discussed, redistricting was specifically recognized by the drafters of the constitution as not only a proper but a critical matter that would be subject to amendment through article XIV, section 3's ballot initiative process. No analogous circumstance was noted or considered by this court when dealing with the term limit question in *CBA II*. For that reason alone, *CBA II* is distinguishable.

¶ 130   I note, moreover, that the focus of the court's discussion in *CBA II* was whether the provisions of the term limit initiative challenged there could be considered both "structural and procedural" or even either of those things within the meaning of article XIV, section 3. In resolving that question, the court simply followed its prior decision in *Coalition I*, 65 Ill. 2d 453, which concluded that to pass muster under article XIV, section 3, an initiative must propose changes that are both structural and procedural in nature, something the initiative challenged in *Coalition I* did not do and did not purport to do. *Id.* at 466-72.

¶ 131   In the course of its discussion in *Coalition I*, this court gave as examples of initiatives that would qualify as both structural and procedural ones involving the conversion from a bicameral to a unicameral legislature or for the conversion from multiple- to single-member legislative districts. *Id.* at 466 (quoted in *CBA II*, 161 Ill. 2d at 529). Nothing in *Coalition I* suggests, however, that the subject matter of the two examples are the only things that may be the sole *topics* of initiative authorized by article XIV, section 3. So restrictive a construction of that provision would, moreover, be incompatible with the history of the provision, with the intention of the drafters, and with the language they used and that the voters approved. It would also directly conflict with our obligation to construe constitutional provisions authorizing ballot initiatives so as to effectuate rather than defeat the people's exercise of their sovereign power to legislate. The circuit court therefore erred when it granted judgment on the pleadings in favor of plaintiffs and against Independent Maps on count V of plaintiff's complaint. As with count VII, that count should have been dismissed.

¶ 132   I turn then to the remaining counts of plaintiffs' complaint, I through IV and VI. Those counts alleged, in the alternative, that even if redistricting qualifies as one of the "structural and procedural subjects contained in Article IV" within the meaning of article XIV, section 3, the proposed ballot initiative is nevertheless invalid because it is not "limited" to those subjects, as article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3), requires. As set forth earlier in this dissent, count I alleged that the initiative goes beyond the requisite limits by imposing additional duties on the Auditor General beyond those specified in article VIII of the constitution (Ill. Const. 1970, art. VIII), which creates the office. Count II alleged that the initiative is unconstitutional because it would alter the jurisdiction of the courts as specified in

the judicial article of the constitution (Ill. Const. 1970, art. VI, § 9). Count III complained that the initiative cannot proceed because, if adopted, it would impose new duties on the Chief Justice of this court and the most senior Justice who is not affiliated with the same political party as the Chief Justice. Count IV contended that the proposed initiative is fatally infirm because it would require members of this court to be affiliated with a political party when no such requirement currently exists under the constitution. Finally, count VI argued that the initiative goes beyond the permissible limits of ballot initiatives by removing the power currently held by the Attorney General to initiate actions concerning legislative redistricting. None of these contentions withstands scrutiny.

¶ 133    As a preliminary matter, a number of plaintiffs' assertions regarding the effect of the proposed ballot initiative are simply incorrect. For example, contrary to the claim made in count II of plaintiffs' complaint, the ballot initiative, if adopted, would not impact the jurisdictional provisions of the judicial article (Ill. Const. 1970, art. VI) at all. The provision of the constitution specifying this court's current jurisdiction over actions concerning redistricting, which is original and exclusive, is not the judicial article but rather is a subject of the legislative article. To the extent there is any mention of jurisdiction over redistricting in the judicial article, it is in the context of the jurisdiction of circuit courts, and the provision defining circuit court jurisdiction simply states that those courts have original jurisdiction of all justiciable matters "except when the Supreme Court has original and exclusive jurisdiction relating to redistricting." Ill. Const. 1970, art. VI, § 9.

¶ 134    By its terms, this jurisdictional grant is entirely conditional. If Independent Maps' ballot initiative were to be approved by the voters and this court's jurisdiction over redistricting was thereby changed from "original and exclusive" to simply "original" in article IV, there would therefore be no conflict at all with article VI, section 9, of the Illinois Constitution. The contingency necessary to trigger the exception noted above would simply be removed. Article VI, section 9 would still make complete sense and be fully operative precisely as currently written.

¶ 135    That such is the case reflects, we think, how carefully and thoughtfully the 1970 Constitution was crafted. By placing the Illinois Supreme Court's jurisdiction over redistricting in the legislative article and thereby making it among the matters subject to amendment through the ballot initiative process under article XIV, section 3, the drafters understood that the scope of this court's jurisdiction over such matters, and by extension, the jurisdiction of the lower courts, might change. The conditional nature of the circuit court's jurisdiction as set forth in the judicial article is an expression of that awareness and a means for insuring that the process for amending the legislative article could be given full effect without the need to revise the judicial article at the same time.

¶ 136    Also erroneous is the claim made by plaintiffs in count IV of the complaint that the ballot initiative is fatally defective because the part of the proposed process that would require participation by two members of this court in the event the redistricting commission failed to adopt a redistricting plan would impermissibly impose a political affiliation requirement on supreme court judges. Contrary to plaintiffs' view, the proposal would not alter current judicial eligibility requirements in any way. One does not need to be affiliated with a political party to serve as a judge of the supreme court. Ill. Const. 1970, art. VI, § 11. Supreme, appellate, and circuit judges are, however, selected for office through partisan elections. Ill. Const. 1970, art.

VI, § 12. While it is theoretically possible for a judge to run and be elected to the supreme court as an independent, we know of no instance in the history of our court where that has occurred. It has certainly not happened since adoption of the judicial article of 1964, the precursor of the judicial article in the 1970 Constitution. Accordingly, while political affiliation is not required, every member of this court in modern times has, in fact, had one.

¶ 137　　　It is true that judges who seek to remain on the bench following expiration of their terms may seek retention through an election process in which their names appear on the ballot "without party designation" (Ill. Const. 1970, art. VI, § 12(d)). Their original party affiliation, however, remains a matter of public record. And while some judges join this court through assignments or appointments to fill vacancies that occur between elections, those appointments are temporary and relatively brief. Ill. Const. 1970, art. VI, § 12(c). Because the Chief Justice is determined, by custom, through seniority, and because the proposed initiative would involve only the Chief Justice and the next most senior Justice not affiliated with the same political party as the Chief Justice, it would be all but impossible for those two positions to be occupied by temporary appointees. And even those appointees would have an ascertainable party affiliation if they had been elected to lower judicial office prior to joining this court. But even if they did not, and even if it were somehow possible for the most senior members of this court to have risen to their positions without any prior political affiliation, it still would not matter. The only requirement under the proposed ballot initiative is that the member of the court who acts with the Chief Justice in carrying out the terms of the procedure when the redistricting commission fails to adopt a plan "not be affiliated with same political party as the Chief Justice." If the Chief Justice were an independent, or if the next most senior member of the court were an independent, or even if all the members of the court were independents and therefore had no party affiliation, the proposed system would still work. That is so because the members of the court who would be participating could not be said to be affiliated with the same political party, and that is all the amendment proposed by the initiative would require. The initiative therefore cannot be assailed on the grounds that it would improperly impose a political affiliation requirement on members of the supreme court.

¶ 138　　　In reaching this conclusion, I am mindful that difficulties in application of the proposed amendment could arise if it were somehow to happen that all seven members of the court ended up belonging to the same political party. In light of modern Illinois history and politics, such an alignment seems so unlikely as to be impossible. But even if there were a theoretical possibility that the process proposed by plaintiffs' initiative could one day prove problematic in practice, that is an entirely separate question from the one before us, which is simply whether the initiative meets the requirements of article XIV, section 3. So long as the proposal is legally valid, its wisdom and flaws are a matter for the voters to decide. They are not a legitimate basis for us to prevent the voters from even considering the matter. Count IV of plaintiffs' complaint therefore fails as a matter of law as well.

¶ 139　　　In count III of their complaint, plaintiffs protested that the very act of involving the Chief Justice and another member of this court in the process when the redistricting commission fails to adopt a plan also crosses an impermissible constitutional line in that it imposes additional responsibilities on members of this court beyond those specified in the judicial article (Ill. Const. 1970, art. VI) and the rules of this court. As is clear from the text of the current version of article IV, section 3 (Ill. Const. 1970, art. IV, § 3), however, this court already plays an integral role in the redistricting process when the redistricting commission fails to file a plan.

The authority for our involvement in that process emanates entirely from article IV, section 3, itself. It is unrelated to anything in the judicial article or our rules. The proposed initiative would therefore have no spillover effects on any other provisions of the constitution. Its effect would be confined to the court's role under section 3 of article IV. While the nature of that role would be different, the change is therefore not subject to challenge on the grounds that it is not "limited to structural and procedural subjects contained in Article IV" as article XIV, section 3, requires. To hold otherwise would mean that the provisions of the legislative article could never be altered unless the supreme court's role in redistricting remain fixed precisely as it is today. That is not what article XIV, section 3, says, and it is incompatible with what the drafters intended when article XIV, section 3, was placed before the voters for ratification. Count III of plaintiffs' complaint is therefore meritless as a matter of law and should also have been dismissed on the pleadings.

¶ 140       Count VI of plaintiffs' complaint, which challenged the ballot initiative based on its removal of an express reference to the Attorney General, is similarly flawed. Article V, section 15, of the Illinois Constitution (Ill. Const. 1970, art. V, § 15) addresses the office of Attorney General. It specifies that the Attorney General is the legal officer of the State and "shall have the duties and powers that may be prescribed by law." The current version of article IV, section 3 (Ill. Const. 1970, art. IV, § 3), confers on the Attorney General one such duty, namely, responsibility for initiating actions concerning redistricting, and specifies how the action is to be brought (in the name of the People of the State of Illinois) and where it is to be filed (in the supreme court). The ballot initiative proposed by Independent Maps eliminates the reference to the Attorney General and the related instruction regarding how the action is to be styled, along with removing language giving the supreme court exclusive jurisdiction over such actions. There is nothing constitutionally suspect about that. Assigning responsibility for who is to bring an action and specifying how it is to be styled and where it should be filed are quintessentially procedural aspects of the redistricting process and therefore place the changes squarely within the bounds authorized by article XIV, section 3, for ballot initiatives. The changes, moreover, have no purpose and would have no effect beyond redistricting. Article V, section 15, would not be not altered in any way. Its provision that the Attorney General shall have the duties prescribed by law would remain fully intact. The only thing changing would be what the law prescribes. That is in no way problematic as a constitutional matter. If a procedure-related duty may be conferred by article IV, section 3, it necessarily follows that it can be removed through an amendment to that provision. To hold otherwise would mean that the right to amend the legislative article through the ballot initiative process reserved to the people under article XIV, section 3, could not be fully realized.

¶ 141       That leaves only count I of plaintiffs' complaint, which alleged that the initiative cannot be said to be limited to procedural and structural subjects contained in article IV because, if adopted, it would confer on the Auditor General additional duties not presently assigned to that office, namely, responsibility for assisting in selection of the new Applicant Review Panel that would be established under the proposed amendment.[11] This contention, as with the others I have just discussed, must be rejected.

---

[11]Under the amendment, the Auditor General would also be involved in requesting and accepting applications to serve as commissioner of the new Independent Redistricting Commission. Count I of plaintiffs' complaint does not challenge this aspect of the Auditor General's participation.

¶ 142    It is true that, unlike this court and the Attorney General, the Auditor General is not presently involved in the redistricting process. The constitution references the Auditor General only in article VIII, section 3 (Ill. Const. 1970, art. VIII, § 3), which mandates that the Auditor General "shall conduct the audit of the public funds of the State" and "shall make additional reports and investigations as directed by the General Assembly." Involving the Auditor General in the redistricting process in the matter contemplated by Independent Maps' proposal would not fall within this charge. Because action by constitutional officers that is not (1) authorized by constitutional provisions creating the position or defining the officer's duties or (2) by legislation promulgated under authority of such constitutional provisions is impermissible (*City of Chicago v. Holland*, 206 Ill. 2d 480, 489-90 (2003)), the constitution must therefore be changed before the Auditor General could perform the responsibilities that would be assigned to him or her under the new system for redistricting.

¶ 143    The amendment proposed by Independent Maps would supply the requisite authority for the Auditor General's participation in the process. That the additional authorization would appear in a different constitutional provision than the one in which the Auditor General's basic duties are defined poses no constitutional problem. Nothing in the 1970 Constitution requires that all of a constitutional officer's responsibilities be set out in a single article, and such is certainly not the case with respect to the redistricting-related duties of this court and the Attorney General under the current redistricting mechanism.

¶ 144    Moreover, the additional duties the Auditor General would assume under the amendment would not alter any of the responsibilities the Auditor General already possesses under article VIII. To the extent the Auditor General's duties would change, the change would pertain solely and exclusively to the redistricting process, which, as set forth earlier, is a structural and procedural subject of article IV and therefore subject to amendment under article XIV, section 3 (Ill. Const. 1970, art. XIV, § 3). The change would have no effect at all beyond that limited sphere.

¶ 145    When the delegates to the 1970 Constitution drafted article XIV, section 3, as they did, they were mindful that attempts could be made to circumvent their intention and use the initiative process as a substitute for legislative action by the General Assembly or to make substantive changes to the constitution unrelated to legislative article. See *Coalition I*, 65 Ill. 2d at 468; *CBA I*, 137 Ill. 2d at 401-04. That is why they made clear that any amendment proposed under article XIV, section 3, "would be required to be limited to subjects contained in the Legislative Article, namely matters of structure and procedure and not matters of substantive policy." 6 Proceedings 1400. In no sense would inclusion of the Auditor General in the redistricting process run afoul of these concerns. It is not an attempt to bypass the General Assembly's authority to enact legislation, nor is it a subterfuge to alter other substantive provisions of the constitution. As I have just noted, the change pertains solely and exclusively to the redistricting mechanism of article IV, section 3, which the amendment proposed by Independent Maps' initiative would replace. Taking into account the limited subject matter to which the initiative power may be applied under article XIV, section 3, while construing article XIV, section 3's provisions "so as to effectuate [its] basic purpose ***, to provide a workable initiative scheme unfettered by restraints which unnecessarily inhibit the rights which article XIV confers" (*Coalition II*, 83 Ill. 2d at 247), I would hold that plaintiffs' challenge to that aspect of the proposed initiative in count I of their complaint must therefore be rejected.

¶ 146    I close my discussion with a few additional observations. As noted earlier in this dissent, the drafters of article XIV, section 3, and the citizens of this state who adopted it acted with a clear and unmistakable appreciation of two things: (1) that the structural and procedural subjects set forth in the legislative article, including the structure of the redistricting commission and the procedure for implementing redistricting as set forth in article IV, section 3, might one day need revision and (2) that the General Assembly could not be counted on to overcome its self-interest and propose the necessary changes itself. Under plaintiffs' reading of article IV, section 3, however, the promise of any real change to the present redistricting system would be rendered illusory. Because all of the current actors in the process also have roles outside of the redistricting process, any proposed change in the cast of characters or any significant alteration of their responsibilities would, by plaintiffs' logic, mean that the proposal was not limited to a structural and procedural subject of article IV and was therefore beyond the constitutionally authorized scope of the ballot initiative process. The potential for a redistricting commission comprised entirely of nonlegislative members, first expressed during the constitutional convention (2 Proceedings 584), would be lost. The only changes that would be permissible would be those of the most limited and inconsequential type, and the only tools available for revision of the redistricting provisions in article VI, section 3, would be those already present in those provisions. If all that can be done is rearrange the pieces, it is difficult to see how meaningful reform could ever be accomplished.

¶ 147    There can be no serious dispute that the drafters and adopters of article XIV, section 3, intended for that provision to allow citizens to actually accomplish *something* through ballot initiatives. Plaintiffs' reading of the law, however, would allow them to accomplish *nothing*. Ballot initiatives would be pointless. To adopt plaintiffs' interpretation would therefore offend one of the most basic precepts of construction, namely, that whenever possible, the constitution and statutes of this state should be construed so that no part of them is rendered meaningless and every word and phrase is given effect. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440-41 (2010); *City of Springfield v. Edwards*, 84 Ill. 626, 640 (1877) (Dickey, J., dissenting). More importantly, and as indicated throughout this dissent, it would require us to abandon our responsibility to construe article XIV, section 3, so as to effectuate that provision's basic purpose and "provide a workable initiative scheme unfettered by restraints which unnecessarily inhibit the rights which article XIV confers." *Coalition II*, 83 Ill. 2d at 247.

¶ 148    As an attempt to refute the conclusion that plaintiffs' construction of article IV, section 3, would make impossible any meaningful ballot initiative regarding redistricting, an argument has been made that a ballot initiative that simply repealed the existing redistricting scheme and replaced it with instructions for the General Assembly to formulate and implement a new redistricting mechanism could pass muster under article XIV, section 3. That argument, however, is also untenable.

¶ 149    First, it would have the effect of stripping away powers and duties of officials who have responsibilities defined in other parts of the constitution. As I have just pointed out, that is a consequence which, under plaintiffs' logic, would doom the proposal on the grounds that it was not limited to a structural and procedural subject of article IV and was therefore beyond the constitutionally authorized scope of the ballot initiative process.

¶ 150    Second, as discussed earlier, article XIV, section 3, was born of the recognition that there were certain changes to the constitution that the legislature, through self-interest, simply could not be counted on to propose itself. Redistricting was one such area. If the only valid ballot initiative regarding redistricting were one which placed responsibility for redistricting back in the hands of the General Assembly, eliminating direct citizen participation in the redistricting process, the entire point of article XIV, section 3, would be defeated. Such a scheme could, moreover, mean the end of redistricting altogether, for once the existing system was repealed and the General Assembly was left with responsibility for implementing a new redistricting system through legislation, it might elect to simply do nothing. If that were to happen, this court would have no authority to compel the General Assembly to act. The only remedy, apart from another constitutional amendment, would be election of a new General Assembly willing to carry out its constitutional duties. *Fergus v. Kinney*, 333 Ill. 437, 440-41 (1928).

¶ 151    In its opinion, the majority states that "we trust that the constitutional confines of article XIV, section 3, are sufficiently broad to encompass more than one potential redistricting scheme." *Supra* ¶ 43. This observation is unquestionably true. The confines *are* broad enough to include a range of possible systems for carrying out redistricting. The problem is that under the contorted and restrictive approach urged by the majority, none of these potential redistricting schemes could possibly pass constitutional muster. All would fail just as this one has failed and for the same reasons. If that were not so, someone, at some point in this litigation, would surely have been able to come up with an example of a redistricting initiative that would actually meet the test the majority has set. No one, including and especially the majority, has been able to do so. The promise my colleagues offer is therefore an empty one.

¶ 152    In *Cole-Randazzo v. Ryan*, 198 Ill. 2d at 244, Justice Thomas warned in his dissent that "gone forever is the Illinois voter's confidence that *** the highest court of this State will ensure that the process of approving and adopting [new legislative maps] will be equitable, balanced, and fair." *Id.* (Thomas, J., dissenting, joined by Garman, J.). If that was not true then, it will certainly be true once the majority's opinion is filed. If we do not permit this ballot initiative to go forward in accordance with the law, our authority over the redistricting process and, indeed, our status as an institution, will forever be suspect.

¶ 153    Finally, nothing in what I have written here should be construed as an expression of support for the proposed ballot initiative. Whether the initiative should be adopted is a question for the voters and the voters alone to decide. Our role is here is limited to determining whether Independent Maps' otherwise valid initiative meets the requirements of article XIV, section 3, and is therefore eligible for inclusion on the ballot at the November 8, 2016, general election. In the exercise of that responsibility, I would hold that it does.

¶ 154    CONCLUSION

¶ 155    For the foregoing reasons, the circuit court erred when it granted judgment on the pleadings in favor of plaintiffs on counts I through VII of their complaint and denied the cross-motion for judgment on the pleadings filed by Independent Maps. Counts I through VII should have been dismissed with prejudice. The judgment of the circuit court should therefore be reversed. Because the remaining counts of plaintiffs' complaint all depend on the viability of the claims asserted in counts I through VII, there would be no need for remand. Those counts also fail as a matter of law. Pursuant to the power conferred on us by Illinois Supreme Court Rule 366(a)

(eff. Feb. 1, 1994) "to make any other and further orders and grant any relief *** that the case may require," we should dismiss those counts with prejudice as well. I therefore dissent.

¶ 156    CHIEF JUSTICE GARMAN and JUSTICE THOMAS join in this dissent.

DISSENT UPON DENIAL OF REHEARING

¶ 157    JUSTICE KARMEIER, dissenting:

¶ 158    Independent Maps moved to recall the mandate in order to permit it to seek rehearing pursuant to Illinois Supreme Court Rule 367 (eff. Aug. 15, 2016). Although our court granted Independent Maps leave to file its petition for rehearing, the majority then summarily denied the petition without further comment or consideration. Independent Maps' petition set forth many reasons why reconsideration should have been allowed. I will mention only a few.

¶ 159    First, the majority's opinion all but ignored the substantive discussion of plaintiffs' various claims and Independent Maps' response. It based its entire judgment on a single argument—involvement of the Auditor General—and left every other point unaddressed. This was so notwithstanding the fact that I addressed every objection in my lengthy dissent.

¶ 160    The dissent laid out why Independent Maps' proposal passed constitutional muster in accordance with the intent of the drafters of the Illinois Constitution of 1970, setting out in detail not only the rationale but the words of the delegates supporting the dissent's position. Rehearing would give the majority the opportunity to rebut the dissent's rationale.

¶ 161    I believe the majority would have considerable difficulty doing so, for long before the constitutional convention at which article XIV, section 3, was adopted, our court actually considered and rejected the very interpretive approach on which the majority's decision here is based. Distilled to its essence, the majority's position is that Independent Maps' initiative fails to meet the article XIV, section 3, requirement that proposed amendments "be limited to structural and procedural subjects contained in Article IV" (Ill. Const. 1970, art. XIV, § 3) because it assigns additional duties to the Auditor General, whose current responsibilities are set forth in a different part of the constitution, namely article VIII, section 3 (Ill. Const. 1970, art. VIII, § 3). The majority's notion that the proposed amendment was doomed because it also impacted a different section of the constitution is nearly identical to one advanced more than a hundred years earlier in a case challenging the validity of a constitutional amendment placed before the voters pursuant to article XIV of the 1870 Illinois Constitution (Ill. Const. 1870, art. XIV), the predecessor to article XIV of the 1970 Constitution, which is at issue here. The case was *City of Chicago v. Reeves*, 220 Ill. 274 (1906), and the amendment challenged there changed article IV, the legislative article, to confer legislative power on the General Assembly to establish local municipal government in the city of Chicago. Included in that change were, among other things, provisions that would authorize creation of new judicial offices and abolition of existing ones, matters which would affect article VI of the 1870 Constitution, the counterpart to the present judicial article, and an additional provision that would permit the city to accrue indebtedness, thus altering a provision of article IX of the 1870 Constitution, dealing with revenue. *Id.* at 283.

¶ 162    When an attempt was made to establish a municipal court in Chicago as the amendment permitted, a taxpayer action was brought to challenge the legislation on the grounds that the constitutional amendment, which provided authorization for the legislation, exceeded the

bounds for amendments permitted by the 1870 Constitution because it was not limited to article IV, the legislative article, but also changed articles VI and IX. Surveying numerous decisions from sister states as well as prior case law from Illinois, we found it "obvious" that while amendments to a particular article of the constitution "must relate to and be germane to the *subject-matter* of the article proposed to be amended," if

> "the effect of the amendment of a particular article is to change other articles of the constitution, and such changes are germane and only incidental to the object sought to be accomplished by the express amendment, then the fact that articles of the constitution other than the article expressly amended are changed does not render the express amendment invalid by reason of the fact that other articles of the constitution are changed to bring the constitution into a harmonious whole, after an amendment has been incorporated into the constitution as a part of a particular article thereof." (Emphasis added.) *Id.* at 290.

¶ 163    It could not be otherwise, this court reasoned, because "[a]ny other view would be so narrow as to prohibit *** in many, if not in all, cases" amendments to the constitution,

> "as the several articles of the constitution are so far connected and dependent upon each other that a change in any article, generally, if not universally, has the effect to produce changes of more or less importance in one or more of the articles of the constitution other than that which is expressly amended." *Id.* at 284.

¶ 164    We made clear, of course, that

> "if the effect of the amendment of a particular article of the constitution is to work changes in other articles of the constitution, and there is no connection between the object sought to be accomplished by the express amendment to a particular article and the changes wrought in other articles of the constitution,—that is, the changes worked, by implication, in other articles than that expressly amended are entirely foreign to the object sought to be accomplished by the express amendment,—a different result would follow." *Id.* at 290.

¶ 165    We also cautioned, however, that when assessing whether a proposed amendment satisfies constitutional requirements governing such amendments, courts should proceed with deference and restraint. Proposed amendments should not be invalidated "unless it clearly appear[s] that the limitations imposed [by the constitution] upon the grant of the power *** to propose amendments to the constitution had been abused, [for] the limitations imposed upon the power *** to propose amendments should not be so construed as to defeat the power itself, except in a case falling clearly within the terms of the limitation." *Id.* at 290-91. In accordance with these principles, the court held that the challenged amendment was, in fact, valid.

¶ 166    Drafters of constitutional provisions are presumed to know existing law and constitutional provisions and to have drafted their provisions accordingly. *Kanerva v. Weems*, 2014 IL 115811, ¶ 41. Although *Reeves* was decided 64 years before the constitutional convention at which article XIV, section 3, was proposed, the case was frequently cited throughout the intervening period and remained good law when the convention convened. See, *e.g.*, *People ex rel. Engle v. Kerner*, 32 Ill. 2d 212, 218 (1965). To interpret article XIV, section 3, without reference to the reasoning and result in *Reeves* would therefore require that we either remove that provision from its historical context or else rewrite history itself. Neither is a permissible mode of constitutional interpretation.

¶ 167    While the challenge in *Reeves* involved a different mechanism for amending the constitution and arose in a different posture than the controversy before us, the reasoning and analysis are fully applicable to this case. The object sought to be accomplished by Independent Maps' proposed amendment is an overhaul of the current mechanism for carrying out redistricting, which is unquestionably a structural and procedural subject of article IV. None of the proposed changes, including inclusion of the Auditor General, can possibly be dismissed as "unconnected" or "entirely foreign" to that objective. To the contrary, to the extent the initiative, if adopted, would result in a change to the Auditor General's duties or affect any other provision of the constitution, implicitly or directly, the change would pertain solely to the redistricting process and have no purpose except as it relates to redistricting. Put another way, those other matters, including the duties of the Auditor General, are in no sense the subject of the proposed amendment. The "subject" for purposes of article XIV, section 2, is the mechanism for redistricting. The assignment of responsibilities to the Auditor General and the other changes that would result from adoption of the amendment are merely ancillary to and supportive of the amendment's core purpose, changing article IV, section 3 (Ill. Const. 1970, art. IV, § 3). Accordingly, here as in *Reeves*, the fact that "articles of the constitution other than the article expressly amended are changed does not render the express amendment invalid." *Reeves*, 220 Ill. at 290.

¶ 168    Rather than taking the opportunity to speak up and explain why it believes the initiative proposed by Independent Maps here must nevertheless be rejected, the majority simply said, without comment, "denied."

¶ 169    Second, the majority suggested that some alternative plan involving a nonlegislative actor other than the Auditor General could be formulated that would meet the requirements of article XIV, section 3. But Independent Maps, in its petition for rehearing, succinctly and correctly points out that the majority's approach would preclude the assignment of any new role in the redistricting process to any nonlegislative actor, not just the Auditor General, because any such changes would be barred by precisely the same barriers erected by the majority to rationalize invalidation of the proposal advanced here. If the majority believes that such is not the case, it should take this opportunity on rehearing to explain why.

¶ 170    Finally, Independent Maps urges the court to reconsider its refusal to consider the other substantive points in the case because it believes that we should, at a minimum, provide some guidance for formulation of future initiatives. I agree, particularly in light of the importance of the rights at stake. Without the critical clarification that rehearing would provide, the majority's disposition not only fails to provide a road map, it erects a roadblock that seems insurmountable.

¶ 171    For all of the foregoing reasons and for the reasons set forth in my original dissent, rehearing should have been granted. I therefore dissent from the denial of rehearing.

¶ 172    CHIEF JUSTICE GARMAN and JUSTICE THOMAS join in this dissent.